UNITED STATES of America, Appellee,

v.

Raymond H. FLYNN, Appellant.

No. 87–1505.

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 14, 1988.

Decided July 27, 1988.

Lawrence J. Fleming, St. Louis, Mo., for appellant.

Frederick R. Buckles, Asst. U.S. Atty., St. Louis, Mo., for appellee.

Before HEANEY, Circuit Judge, BRIGHT, Senior Circuit Judge, and WOLLMAN, Circuit Judge.

BRIGHT, Senior Circuit Judge.

The United States, in a three-count indictment, charged appellant Raymond H. Flynn with violating and conspiring to violate the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1962(c) and (d), (counts I and II), and with interstate transportation of an explosive in violation of 18 U.S.C. § 844(d) (count III). According to the indictment, Flynn participated in an organization which engaged in a series of violent crimes in an attempt to obtain and maintain control of various labor unions and to retaliate against leaders of rival groups, organizations and families for acts committed against the enterprise.

The United States District Court [1] for the Eastern District of Missouri, upon a trial by jury, convicted Flynn of the crimes charged against him.

Flynn raises a number of issues on appeal from the convictions, including the admissibility of hearsay testimony and recorded conversations pertaining to crimes in which Flynn was not an active participant, sufficiency of the evidence for conviction on all counts, the propriety of certain comments made by the Government in its closing arguments and the refusal of the district court to suppress the fruits of the Government's electronic surveillance. We

1. The Honorable John F. Nangle, Chief Judge, United States District Court for the Eastern District of Missouri.

affirm the RICO convictions, counts I and II, but reverse count III, transportation of the explosive for insufficiency of the Government's evidence.

## I. BACKGROUND [2]

As required for appellate review, we state the facts in the light most favorable to the jury's verdict. *United States v. Minor*, 815 F.2d 472, 473 (8th Cir.1986).

### A. Spica Bombing

On October 4, 1979, appellant Flynn became the business manager of Local 42 of the Laborers' International Union in St. Louis, Missouri. Shortly thereafter, Anthony Giordano, considered by many to head the Italian organized crime faction in St. Louis, called a meeting with Flynn and others to discuss his plans for including an Italian influence in Local 42. To include the Italian influence in Local 42, Anthony Giordano placed an associate, John Paul Spica, into that Local. The Italians at that time did control a different laborers' local, Local 53.

Spica bragged to Paul Leisure of his intent to kill Flynn and take over Local 42. Paul Leisure and his brother, Anthony Leisure, were, at the time, attempting to take control of the third laborers' local in St. Louis, Local 110, and thus were concerned that a successful takeover of control of Local 42 by the Italians next would lead to an attempt by the Italians to control Local 110. Paul Leisure, therefore, in an effort to forge an alliance with Flynn and to more effectively thwart the Italians' takeover attempts of Local 42, told Flynn of Spica's intention to kill Flynn.

Paul Leisure thereupon began a campaign to learn Spica's daily habits and to gain his trust and confidence. His brother, Anthony Leisure, obtained a car similar to that driven by Spica on which he and Flynn could practice wiring a bomb to the car. Flynn and Anthony Leisure made several attempts to place the bomb on Spica's car. Finally, on the night of November 7–8, 1979, they succeeded. On the morning of November 8, 1979, the bomb exploded as Spica sat in his car, killing him.

### B. Michaels, Sr. Bombing

In the meantime, beginning in the late 1970s, Paul and Anthony Leisure encountered difficulties in securing and maintaining control of Local 110. Prior to his death in June of 1977, Ray Massaud, Local 110's business manager, reached an agreement with Anthony Leisure that upon Massaud's death, his son, John Massaud, would become Local 110's business manager, but that John would act only as a figurehead. Ray Massaud then created a separate but equal position of assistant business manager for Anthony Leisure with the understanding that Leisure could hire and fire organizers and business agents for the Local. Anthony Leisure hired Ronald Joseph Broderick, a Leisure associate, to assist Anthony in securing control of the union. Broderick served as a union organizer.

Over the next year, the Leisures discovered that the agreement did not work as planned. John Massaud hired relatives of both Giordano and James Michaels, Sr., the reputed head of the Syrian organized crime faction in St. Louis, without consulting Anthony Leisure. At this time, the Leisures discussed the possibility of murdering John Massaud, but decided against it for fear of starting a war with the Italians.

When the Leisures learned that Mike Trupiano, a nephew of Anthony Giordano and president of Local 110, and John Massaud planned to fire Broderick because Broderick was neither Italian nor Syrian, the Leisures realized their failure in exercising complete control over the Local. In an attempt to solidify their power base in Local 110, the Leisure group decided that someone had to be killed. The group considered killing Trupiano but decided against it because they feared it would anger some Italians. The group settled on murdering James Michaels, Sr. Not only would his death avenge the murder of

---

**2.** The underlying facts in this case are essentially the same as those presented in *United States* *v. Leisure*, 844 F.2d 1347 (8th Cir.1988).

Richard Leisure in the early 1960s,[3] but it would also make possible the firing of Francis Michaels, Michaels, Sr.'s brother, and James Michaels, Michaels, Sr.'s grandson, from the Local, thus leaving two vacancies for Anthony Leisure to fill. Thus, in their view, Paul Leisure would become the head of the Syrian organized crime faction in St. Louis.

Paul and Anthony Leisure then planned the bombing of Michaels, Sr. Leisure associate Fred Prater constructed a bomb using a remote control device provided by an associate, Charles Loewe. Another associate, John Ramo, installed safety devices on the bomb. Anthony Leisure supplied the dynamite. They stored the bomb at L.N. & P., a towing company in St. Louis owned by the Leisures and Fred Prater.

Various members of the Leisure group surveilled Michaels, Sr., learning his habits and routine. Anthony and David Leisure and Broderick watched Michaels, Sr. on a southern Illinois golf course and David Leisure used the apartment of a friend to observe Michaels, Sr.'s movements at a local church where Michaels, Sr. often ate lunch. Anthony and David Leisure practiced placing the bomb on the underside of a stolen vehicle identical to that driven by Michaels, Sr.

On September 17, 1980, Anthony and David Leisure, Ramo and Broderick drove in a van to the place where Michaels, Sr. was having lunch and David Leisure placed the bomb on the underside of Michaels, Sr.'s car. Paul Leisure instructed Charles Loewe to act as a spotter in the area and to radio in any problems. As Michaels, Sr. drove down Interstate 55 in South St. Louis County, the bomb exploded, killing Michaels, Sr. in the blast. Eventually, Michaels, Sr.'s relatives were driven from Local 110.

The Government presented no evidence implicating Flynn in the Michaels, Sr. bombing.

## C. The Fredericktown Surveillance

On August 11, 1981, less than one year after the death of Michaels, Sr., Paul Leisure sustained serious injury, losing the bottom portion of both legs, when a bomb exploded in his car in front of his residence in St. Louis. After learning from John Vitale, who succeeded Giordano as head of the Italian faction of organized crime in St. Louis, that Paul Leisure's bombing resulted from "a family thing," the Leisure group concluded that the Michaels family caused Paul Leisure's injuries. Learning that local law enforcement officials focused their investigation on the Michaels family, the Leisure group was reinforced in this conclusion.

On one occasion, in the few weeks following the bombing, Flynn, Anthony Leisure and Joe Broderick drove to the Michaels family farm in Fredericktown, Missouri, intending to kill those present. No one was at the house, but Flynn, Anthony Leisure and Broderick discussed ways to kill persons who might use the house. Flynn suggested dangling dynamite down the chimney and blowing up everyone present.

## D. The Edge Shooting

In another attempt to avenge the bombing of Paul Leisure, Anthony and David Leisure shot John Charles Michaels, grandson of Michaels, Sr., at The Edge Restaurant in St. Louis. Prior to the shooting, Anthony Leisure, Joe Broderick and Fred Prater watched the restaurant and prepared an abandoned building next to the restaurant to facilitate the shooting and getaway. Charles Loewe drove Anthony and David Leisure to the site, where the Leisures fired on Michaels and a friend, one Dennis Day. The Leisures then fled in a van driven by Joe Broderick.

The Government produced no evidence implicating Flynn in the shooting.

---

**3.** In the early 1960s, Richard Leisure, David Leisure's brother and Paul and Anthony Leisure's cousin, was shot and killed by Norm Peters, an associate of Michaels, Sr. Michaels, Sr. used his influence to help Peters escape retribution for the murder. See the relation of facts in *United States v. Leisure,* at 1351.

### E. Plans to Murder Bob Peters

The Leisure group believed that Bob Peters, who worked at Pepsi–Cola, was a member of the Michaels group. They devised a plan whereby Anthony Leisure would shoot Peters as he left work one afternoon. They abandoned the plan when a workman appeared who may have seen Anthony Leisure and Loewe.

### F. The Faheen Bombing

The Leisures also suspected that George "Sonny" Faheen, a nephew of Michaels, Sr., had participated in Paul Leisure's bombing. David Leisure, Charles Loewe and other Leisure associates, including Michael Kornhardt, Frank Termine and Malcolm "Mike" Flinn,[4] appellant's brother, watched Faheen, learning his daily habits, where he lived and where he worked. They obtained a car similar to that driven by Faheen to use as a practice vehicle for placing a car bomb.

On October 15, 1981, David Leisure and John Ramo met Anthony Leisure, Broderick and Flynn at a local fast food restaurant. Flynn opened the trunk of his car revealing dynamite. Flynn commented that he obtained it "from across the river from Ski," an apparent reference to an associate, Stanley Kowalski, who lived in Illinois. They placed the dynamite in David Leisure's car. During the course of their discussions, Flynn said that he did not think the Mansion House parking garage, where Faheen parked his car, would serve as a good site to place a bomb on Faheen's car because the area was too populated.

The following day, David Leisure and Michael Kornhardt picked up a bomb from Charles Loewe and attached the bomb to Faheen's car in the Mansion House garage. The bomb exploded when Faheen started his car. The explosion trapped Faheen in the car and he burned to death. This murder underlays the interstate transportation of explosives charge.

4. We note a difference in spelling of the given name Flynn or Flinn.

5. The Government initially tried Carbaugh with the Leisures, Wougaman and Loewe but the

### G. The Kornhardt Murder

Authorities arrested Michael Kornhardt and charged him with Faheen's murder. Fred Prater obtained Kornhardt's release on bail using Prater's real properties as security for the bail bond. Because various members of the Leisure group, however, believed that Kornhardt might cooperate with the authorities, the group planned to kill Kornhardt. Flynn expressed concern about Kornhardt talking to law enforcement people and worried that Kornhardt might implicate Malcolm Flinn in the Faheen killing. David Leisure, at Paul Leisure's direction, enlisted the aid of Robert Carbaugh and Steven Wougaman to murder Kornhardt. On July 31, 1982, Carbaugh and Wougaman lured Kornhardt into a rural area of St. Charles County, Missouri, on the pretext of committing a burglary. Carbaugh shot Kornhardt twice in the head. Carbaugh and Wougaman thereupon became members of Local 42.

The Government presented no evidence implicating Flynn in Kornhardt's murder.

### H. Indictments and Trial

The following month, in August of 1982, Fred Prater received a grant of immunity and became a Government witness. On April 13, 1983, the grand jury indicted Paul, Anthony and David Leisure, Broderick, Ramo, Carbaugh, Loewe and Wougaman on RICO and other charges. Ramo, Broderick and Carbaugh eventually pled guilty.[5] In April of 1985, a jury convicted Paul and David Leisure and Wougaman on all counts against them. The jury, however, convicted Anthony Leisure and Loewe only of the substantive RICO and RICO conspiracy counts against them. This court affirmed the convictions on appeal except for two of the counts against Wougaman. *United States v. Leisure*, 844 F.2d 1347 (8th Cir.1988).

jury could not reach a verdict on the charges against him. On the eve of the date set for retrial, Carbaugh entered a guilty plea.

The indictment against Flynn, filed July 24, 1986, after the Leisure convictions, contains three counts. Count I charges a RICO violation, 18 U.S.C. § 1962, consisting of three acts of racketeering activity: (1) conspiracy to murder, and the murder of, John Paul Spica; (2) conspiracy to murder James Anthony Michaels III and others; and (3) conspiracy to murder, and the murder of, George "Sonny" Faheen.

Count II charges a conspiracy to violate the RICO statute, 18 U.S.C. § 1962(d), and consists of six overt acts in furtherance of the conspiracy:

### OVERT ACTS

In furtherance of this conspiracy and to effect the objects thereof, the following overt acts were committed:

1. Between October 4, 1979 and November 7, 1979, the exact date being unknown to the Grand Jury, RAYMOND H. FLYNN and others met and had a discussion concerning a threat made by John Paul Spica to kill RAYMOND H. FLYNN in an effort to take over leadership of Laborers' Local 42 of the Laborers' International Union.

2. Between October 4, 1979 and November 7, 1979, the exact date being unknown to the Grand Jury, in St. Louis, Missouri, RAYMOND H. FLYNN and others obtained and examined a 1977 Cadillac automobile similar to the one then being used by John Paul Spica.

3. On or about November 7, 1979, in St. Louis County, Missouri, RAYMOND H. FLYNN attached an explosive device to a 1977 Cadillac automobile then being used by John Paul Spica.

4. Between August 11, 1981 and September 11, 1981 RAYMOND H. FLYNN and others drove in an automobile to the vicinity of Fredericktown, Missouri.

5. On or about October 15, 1981 RAYMOND H. FLYNN and others met and had a conversation on the parking lot of a restaurant in St. Louis, Missouri.

6. On or about October 15, 1981, on the parking lot of a restaurant in St. Louis, Missouri, RAYMOND H. FLYNN

delivered to others a quantity of explosives.

Count III charges Flynn with interstate transportation and receipt of dynamite, with the knowledge and intent that it would be used to kill or injure George "Sonny" Faheen in violation of 18 U.S.C. § 844(d).

As we have observed, the federal jury returned a guilty verdict against Flynn on all counts. The district judge sentenced him to twenty years in prison on both counts I and II and to forty-five years in prison on count III, all to run concurrently.

We address Flynn's contentions on appeal.

## II. ELECTRONIC SURVEILLANCE

Flynn challenges the admission into evidence of tape-recorded conversations obtained through electronic surveillance. Flynn incorporated by reference into his brief the argument advanced by the appellants in *United States v. Leisure, supra.* The *Leisure* panel upheld the validity of the wiretaps in a comprehensive and well-reasoned opinion. We are bound by the prior panel opinion and thus affirm the district court's denial of Flynn's motion to suppress evidence obtained from the electronic surveillance of the L.N. & P. offices and of Paul Leisure's home.

## III. RICO CHARGE

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity * * *.

18 U.S.C. § 1962(c). An enterprise includes, *inter alia*, "any * * * group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The pattern of racketeering activity "requires at least two acts of racketeering activity", 18 U.S.C. § 1961(5), as defined by the statute.

A. Sufficiency of the Evidence

Flynn argues that his motion for judgment of acquittal should have been granted by the district court because the evidence against him on the RICO counts did not support the jury's verdict.

> In reviewing a denial of a motion for judgment of acquittal "we must view the evidence in the light most favorable to the [G]overnment." *United States v. Springer*, 831 F.2d 781, 783 (8th Cir. 1987), *cert. denied,* — U.S. ——, 108 S.Ct. 1117, 99 L.Ed.2d 277 * * * (1988) (citations omitted). We also must give the Government "the benefit of all reasonable inferences that may logically be drawn from the evidence." *Id.* at 783–84 (citations omitted). "A motion for acquittal should be granted only where 'the evidence, viewed in the light most favorable to the Government, is such that a reasonably minded jury *must* have a reasonable doubt as to the existence of any of the essential elements of the crime charged.'" *United States v. White*, 562 F.2d 587, 589 (8th Cir.1977) (per curiam) (citations omitted; emphasis in original), *quoted in United States v. DeLuna*, 763 F.2d 897, 924 (8th Cir.), *cert. denied,* 474 U.S. 980 [106 S.Ct. 382, 88 L.Ed.2d 336] (1985).

*United States v. Adkins*, 842 F.2d 210, 212–13 (8th Cir.1988).

■ Flynn first argues that the Government did not present sufficient evidence at trial to prove the existence of an enterprise. To ensure that RICO does more than subject ordinary criminals to heightened punishment, "an 'enterprise' must exhibit three basic characteristics: (1) a common or shared purpose; (2) some continuity of structure and personnel; and (3) an ascertainable structure distinct from that inherent in a pattern of racketeering. *United States v. Bledsoe*, 674 F.2d [647] at 665 [(8th Cir.1982)]." *United States v. Lemm*, 680 F.2d 1193, 1198 (8th Cir.1982), *cert. denied,* 459 U.S. 1110, 103 S.Ct. 739, 74 L.Ed.2d 960 (1983).

■ In *United States v. Leisure*, the panel evaluated substantially the same evidence of the enterprise in light of a challenge by the appellants to the sufficiency of the evidence with regard to the existence of a RICO enterprise. The *Leisure* panel found sufficient evidence of the enterprise. We agree with the panel on this issue and quote extensively from that opinion.

> The Leisure group acted out of a common purpose to dominate local labor unions, profit economically from this domination, and murder opponents of their efforts to the extent necessary. The structure and personnel of the Leisure group was continuous and consistent throughout the entire period of racketeering activity. Paul Leisure directed and coordinated the group, except during the period of recovery from his own bombing injuries, when Anthony Leisure stood in his place. Paul Leisure, Anthony Leisure, David Leisure, John Ramo, Joe Broderick, Fred Prater, and Charles Loewe were members of the Leisure group during the entire period of the racketeering events. Each member participated in nearly all of the criminal acts. Finally, the Leisure group clearly had an ascertainable structure distinct from that inherent in the conduct of this pattern of racketeering activity, that is, the sequence of murders and attempted murders. This structure is found in the family and social relationships between the members of the group, and their concerted attempt to gain control of the local unions, which can be viewed in complete isolation from the group's pattern of racketeering activity. Of course, the murders and attempted murders in themselves also shed light on this structure. As the Supreme Court has recognized, "the proof used to establish these separate elements may in particular cases coalesce." *United States v. Turkette*, 452 U.S. [576,] 583 [101 S.Ct. 2524, 2529, 69 L.Ed.2d 246 (1981)]. Indeed, the evidence in this case seems to fall squarely within an example of a RICO enterprise previously given by this court: "Th[e] distinct structure [of a RICO enterprise] might be demonstrated by proof that ... it has an organizational pattern or sys-

tem of authority beyond what was necessary to perpetrate the predicate crimes. The command system of a Mafia family is an example of this type of structure." *United States v. Bledsoe,* 674 F.2d at 665.

In sum, this is not a case of "a sporadic and temporary criminal alliance to commit one of the enumerated RICO crimes." *United States v. Lemm,* 680 F.2d at 1201. We conclude, therefore, that the evidence adequately supported the jury finding that the Leisure group was a RICO enterprise.

*United States v. Leisure,* 844 F.2d at 1364.

Flynn further argues that even if the Government did present sufficient evidence to prove the existence of a RICO enterprise, this evidence did not prove his participation in the enterprise. We disagree.

The indictment in this case broadly defined the purposes of the enterprise:

> to enrich its members financially; to murder leaders and members of rival groups, organizations, and families; to retaliate against leaders and members of rival groups, organizations, and families for acts committed against associates of the enterprise; to avoid, discover and obstruct investigations and prosecutions of associates and activities of the enterprise by law enforcement officials.

That Flynn shared these purposes with the other members of the enterprise is disclosed from the evidence. He joined with the enterprise to preserve his power within the labor unions and conspired with others to commit acts aimed at preserving the integrity of the enterprise. He placed the bomb on Spica's car and engaged in acts of retaliation for the bombing of Paul Leisure. The only activities in which Flynn did not participate were those surrounding the Michaels' murder, including discussions of killing Mike Trupiano and John Massaud. When Flynn left his position in Local 42 due to a pending lawsuit,[6] he placed Paul Leisure in the Local so that Flynn could continue to influence the Local's policies. Thus, Flynn's participation in the enter-

prise amounted to more than the mere predicate acts with which he was charged; he actively participated in the Leisure enterprise.

■ Flynn also argues that the evidence failed to show that his activities promoted his economic interests in the enterprise. For purposes of RICO, an enterprise must be directed toward an economic goal. *United States v. Anderson,* 626 F.2d 1358, 1372 (8th Cir.1980), *cert. denied,* 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981). *See also United States v. Ivic,* 700 F.2d 51, 59–65 (2d Cir.1983). The members of the Leisure enterprise directed their activities toward controlling St. Louis' labor unions. That goal served to promote an economic purpose.

We conclude that the evidence presented against Flynn on counts I and II, the substantive RICO and RICO conspiracy counts, is sufficient to require that we sustain Flynn's convictions on those counts.

### B. Co–Conspirator's Statements

At trial, the Government placed into evidence conversations intercepted through electronic surveillance of the offices at L.N. & P. and of Paul Leisure's home, as well as the testimony of Leisure associates Prater, Broderick and Ramo. The recorded conversations and the testimony of these witnesses included evidence of the three predicate acts with which Flynn was charged, *i.e.,* the Spica bombing, the conspiracy to murder Michaels III and others and the Faheen murder, and, in addition, evidence of the murder of Michaels, Sr., including discussions of considering whether or not to murder John Massaud and Mike Trupiano. The Government also presented evidence of acts of retaliation for the bombing of Paul Leisure, including the shooting at The Edge, the Kornhardt murder and plans to murder Bob Peters. The indictment does not allege that Flynn participated in those latter acts and the Government presented no evidence that he did, in fact, participate in them.

---

**6.** The record is not clear precisely why Flynn left Local 42. The Government in its brief states only that he left because of a pending lawsuit.

Flynn objects to the admission of evidence of crimes in which he did not participate, arguing that the evidence is inadmissible hearsay. An out-of-court statement is not hearsay and is admissible if, on the basis of independent evidence, the court is convinced that it is more likely than not that the statement was made during the course and in furtherance of a conspiracy to which the declarant and the defendant were parties. Fed.R.Evid. 801(d)(2)(E); *United States v. Bell*, 573 F.2d 1040, 1044 (8th Cir.1978). The district judge, following the strictures of *United States v. Bell*,[7] found that the Government produced sufficient evidence of a conspiracy to support the admission of those statements.

Flynn challenges the admissibility of evidence of crimes in which he did not participate, asserting that they are not the crimes of any conspiracy of which he was shown to be a member and were not made in furtherance of any conspiracy alleged in the indictment or of which Flynn was shown to be a member.

### 1. Admissibility of Co–Conspirator's Statements Relating to Revenge for the Bombing of Paul Leisure

■ The Government proffered evidence of Flynn's participation in the attempts to retaliate against the Michaels family for the Paul Leisure bombing. The evidence links Flynn to these acts and, thus, the statements of those with whom he conspired are admissible against him. Fed.R. Evid. 801(d)(2)(E). This is true even for those acts done in retaliation for Paul Leisure's bombing in which Flynn did not directly participate, *i.e.*, the shooting at The Edge, the Kornhardt murder and plans to murder Bob Peters. The evidence sufficiently establishes that Flynn conspired with the other members of the enterprise to retaliate for Paul Leisure's bombing. He clearly expressed his intent to do so when he commented to other members of the group, "something has to be done quick about this. I have strong feelings for that

guy [Paul Leisure] in there. And you have to move fast to get the people responsible for this." Further evidencing Flynn's desire for retaliation is his trip with Broderick and David Leisure to Fredericktown to find members of the Michaels family to kill.

■ Furthermore, this evidence of retaliation for the Leisure bombing is admissible to prove the enterprise element of the RICO counts. In order to prove the existence of a RICO enterprise, the Government must demonstrate (1) a common or shared purpose which animates those associated with it, (2) that the enterprise functions as a continuing unit and (3) that it has an ascertainable structure distinct from the pattern of racketeering activity. *United States v. Bledsoe*, 674 F.2d 647, 664–65 (8th Cir.), *cert. denied*, 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 608 (1982). To make such proof, the Government is required to provide detailed evidence of the workings of the enterprise. The evidence of the attempts to retaliate for Paul Leisure's bombing provides insight into the purposes of the Leisure enterprise, demonstrating its consistent structure and the roles of each participant, and was relevant and admissible.

In *United States v. Finestone*, 816 F.2d 583, 587 (11th Cir.), *cert. denied*, — U.S. —, 108 S.Ct. 338, 98 L.Ed.2d 365 (1987), the Eleventh Circuit held that in a RICO drug ring prosecution, the district court properly admitted, at a joint trial of several defendants, evidence of a kidnapping and execution-style murder in which the defendant Finestone did not participate. The Eleventh Circuit specifically held that the evidence could be admitted to prove, among other things, a pattern of racketeering activity and overt acts of the conspiracy, an element of the RICO conspiracy charge. *Id.*

This circuit, in *United States v. Ellison*, 793 F.2d 942 (8th Cir.), *cert. denied*, 479 U.S. 937, 107 S.Ct. 415, 93 L.Ed.2d 366

---

**7.** Under *United States v. Bell*, 573 F.2d 1040, 1044 (8th Cir.1978), the court may conditionally admit the hearsay statements presented by the Government. At the close of the Government's case, the court must then explicitly rule on the admissibility of the statements, *i.e.*, that they were made by a co-conspirator during the course and in furtherance of the conspiracy.

(1986), made a similar ruling. There, the district court denied the RICO defendant's motion in limine to prohibit the government from proving that a white supremacist group constituted an enterprise by introducing evidence, which included testimony that group members attempted to blow up a natural gas pipeline, attempted to burn a Jewish community center, stole jewelry from a pawn shop and used and accumulated firearms and explosives on group property. The indictment did not charge these crimes against the defendant. The court stated, "we cannot say that the prejudicial aspects of the disputed evidence outweigh its probative value, and thus we hold that the District Court did not abuse its discretion in refusing to exclude the Government's evidence *establishing that CSA was an enterprise for RICO purposes." Id.* at 949 [emphasis added].

■ Flynn also argues, however, that this evidence should have been excluded because its prejudicial nature outweighs its probative value. Fed.R.Evid. 403. We review such decisions under the abuse of discretion standard, *Ellison,* 793 F.2d at 949. No abuse of discretion is shown by admitting evidence of those acts of the enterprise aimed at retaliating against the Michaels family for Paul Leisure's bombing.

### 2. The Michaels' Murder and Discussion of Killing Trupiano and Massaud

■ We are, however, disturbed by the admission into evidence of the discussions of the possible murder of Mike Trupiano and John Massaud and the ultimate decision to murder Michaels, Sr., together with the evidence of Michaels, Sr.'s murder. The Government presented no evidence linking Flynn to these acts.

The RICO statute has a tremendous potential for guilt by association. *See United States v. Bledsoe,* 674 F.2d at 664. When the government introduces every bad act of an enterprise, including those in which the defendant does not participate, it magnifies the potential for imputing guilt to a defendant solely on the basis of the company he keeps and Fed.R.Evid. 403 is implicated.

While the evidence of these acts tended to prove the enterprise element of the RICO statute, in our view, the district court erred in admitting this evidence. The evidence of discussions concerning possibly killing Massaud and Trupiano and of the Michaels' murder, in light of the overwhelming evidence presented at trial, was not necessary to prove the existence of the enterprise. The evidence obviously carried a prejudicial impact, yet in no way did it connect Flynn to the enterprise. Its prejudicial value outweighed its probative value. Fed.R.Evid. 403.

■ Nevertheless, under the circumstances, the district court's error does not warrant a new trial. The court's instructions to the jury made very clear that in order to convict Flynn on count I, the substantive RICO count, it must find beyond a reasonable doubt that Flynn engaged in at least two of the three predicate acts *charged in the indictment.* Similarly, the court instructed the jury that in order to convict Flynn of count II, conspiracy to violate RICO, the jury must find that Flynn conspired to commit two of the three acts of racketeering activities alleged in count I of the indictment. The jury being thus properly instructed, we have no reason to believe that it convicted Flynn based on other crimes in which he did not participate.

In addition, the testimony would have been admissible if Flynn had been tried with the rest of the Leisure group, provided the appropriate instructions had been given, as they were here. Finally, the evidence of the murder of Michaels, Sr. and the discussions of murdering Massaud and Trupiano was no more inflammatory than the evidence of the crimes in which Flynn participated. Thus, the actual prejudice suffered by Flynn due to the erroneously admitted evidence is insufficient to require a new and lengthy trial.

### 3. The "In Furtherance" Requirement of Conspirator's Statements

Flynn also argues that the co-conspirators' statements were not made in further-

ance of the conspiracy as required by Fed. R.Evid. 801(d)(2)(E). This court construes the "in furtherance" requirement broadly. *United States v. Massa*, 740 F.2d 629, 638 (8th Cir.1984), *cert. denied*, 471 U.S. 1115, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985). We have carefully reviewed the challenged evidence and find no indication that the statements were made other than in furtherance of the conspiracy. Even those statements which Flynn deems inadmissible because they discuss past events were made to "pull the troops together" and provide renewed fervor among the members of the conspiracy. *See United States v. Leisure*, 844 F.2d at 1361, discussing the same argument in light of essentially the same evidence.

## IV. CLOSING ARGUMENT

■ Flynn complains of two lines of closing argument made by the Government. Flynn argued that, of some 750 hours of tape-recorded conversations intercepted by the Government, only two conversations contained Flynn's voice and those two were totally unrelated to the crimes demonstrated by the evidence. In rebuttal, the Government argued that the number of times a person's voice appears on tape is not determinative of guilt, pointing out, over Flynn's objection, that during the trial Anthony Leisure's voice appeared only twice in tape-recorded conversations and Anthony Leisure "is in there up to his ears." Flynn contends that the Government's comments were without any support in the record.

In its rebuttal argument, the Government discussed witness Donna Lansing's testimony at trial. Lansing was brought face-to-face with Flynn and asked by Flynn's attorney if she could identify Flynn as a man she saw at the site of the Spica bombing two nights before Spica was killed. The Government stated, "[h]er voice quivered, she had to ask [Flynn's attorney] to repeat the question." Flynn contends that the Government improperly characterized Lansing's voice as quivering when it did not, in fact, quiver.

Flynn argues that, given the weak case against him, the Government's improper closing arguments warrant reversal of his convictions.

The trial court has broad discretion in controlling closing arguments. *United States v. Lewis*, 759 F.2d 1316, 1350 (8th Cir.), *cert. denied*, 474 U.S. 994, 106 S.Ct. 406, 88 L.Ed.2d 357 (1985); *United States v. Bohr*, 581 F.2d 1294, 1301 (8th Cir.), *cert. denied*, 439 U.S. 958, 99 S.Ct. 361, 58 L.Ed. 2d 351 (1978). Absent a showing of abuse of discretion, this court will not reverse. *United States v. Bohr*, 581 F.2d at 1301.

We review the prosecutor's statements in the entire context of the trial to determine whether the argument complained of was so offensive as to deprive Flynn of a fair trial. *United States v. Lewis*, 759 F.2d at 1350; *United States v. Bohr*, 581 F.2d at 1301.

The district court did not commit prejudicial error in permitting these statements by the Government.[8] In the context of the entire trial, we cannot say that the statements to which Flynn objects were so offensive as to deprive Flynn of a fair trial.

The Government did not prejudice Flynn when it compared the number of times Flynn's voice appears on tape with the number of times Anthony Leisure's voice appears on tape. The Government's argument is supported by the record before us; Anthony Leisure's voice appears on just two tapes, exhibits 111 and 112. Furthermore, the Government's remarks were prompted by Flynn's argument and, thus, do not comprise reversible error. *United States v. Lee*, 743 F.2d 1240, 1253 (8th Cir.1984).

■ Flynn's assertion that he was prejudiced by the Government's characterization of witness Lansing's voice as quivering is also without merit. Because we have before us only a written transcript, we cannot determine if Lansing's voice quivered or not. The jury, however, heard

---

8. We note that Flynn did not object to the statements with regard to Lansing's testimony. In view of our holding that the argument did not violate Flynn's right to a fair trial, we need not address Flynn's failure to preserve the issue for appeal.

Lansing's testimony and was in the best position to evaluate her demeanor. Because the jury could accept or reject the Government's characterization of Lansing's testimony based on what it observed at trial, we do not believe that the Government's characterization of her voice as quivering, even if wrong, so prejudiced Flynn as to warrant reversal of his RICO convictions. Contrary to Flynn's assertion, the case against him on the RICO charges was not weak. Further, the jurors heard Lansing's testimony and were in a position to accept or reject the Government's characterization of her testimony.

## V. COUNT III—INTERSTATE TRANSPORTATION OF DYNAMITE

 Flynn argues that the Government presented insufficient evidence on count III, transportation and receipt of dynamite in interstate commerce in violation of 18 U.S.C. § 844, to support the jury's verdict of guilt. We agree.

At trial, Broderick testified that on the day before the Faheen bombing he drove Anthony Leisure to the White Castle restaurant at Vandeventer and Chouteau Streets in St. Louis, Missouri, intending to meet Flynn. While they were sitting in Broderick's car on the parking lot, Flynn arrived. Flynn parked his car, walked over to Broderick's car, joined Broderick and Leisure in the car, and announced, "I got that stuff from Ski across the river." Flynn further commented, "[t]he guy said I got ten sticks and we can get as much as we want. He told me there is no limit." As they sat in Broderick's car waiting for David Leisure to arrive, Flynn expressed his concern that the Mansion House was not a good location to place the bomb on Faheen's car because of its location in a busy and populated area.

Thereafter, David Leisure arrived with Ramo and pulled his car next to Flynn's car. Anthony Leisure and Flynn joined David Leisure outside the cars. Anthony, David and Flynn walked over to the two cars, opened the trunks and, according to Broderick who was still in his car, took a sack or burlap bag out of Flynn's car and placed the container in David Leisure's car. The group then split up.

Ramo testified similarly. He stated that he and David Leisure drove to the White Castle restaurant on the day before the Faheen bombing. When they arrived, Flynn, Anthony Leisure and Broderick were present. After parking his car, David Leisure went over to the others and spoke to them, returned to his vehicle and moved it next to Flynn's car. Flynn and David Leisure opened the trunks of their respective cars and transferred a shopping bag and a gym bag from Flynn's car to David Leisure's car. Ramo, who was standing by the cars while the transfer took place, saw dynamite in the shopping bag.

We agree that sufficient evidence exists to demonstrate that Flynn probably provided the dynamite for the Faheen bombing.[9] However, the prosecution failed to provide any substantial evidence showing that the dynamite travelled in interstate commerce. Title 18 U.S.C. § 844(d) prohibits transportation and receipt *in interstate commerce* of any explosive with knowledge or intent that it will be used to kill, injure or intimidate any individual. The interstate nexus is an element of a section 844(d) crime. *See United States v. Michaels*, 796 F.2d 1112, 1118 (9th Cir.1986), *cert. denied*, 479 U.S. 1038, 107 S.Ct. 893, 93 L.Ed.2d 845 (1987) and *United States v. Carlson*, 561 F.2d 105, 108 (1st Cir.), *cert. denied*, 434 U.S. 973, 98 S.Ct. 529, 54 L.Ed.2d 464 (1977).

The only evidence presented by the Government to prove that the dynamite Flynn provided for the Faheen bombing had travelled in interstate commerce is

**9.** Flynn attacks this evidence on several grounds. He argues that the evidence is insufficient because (1) Broderick and Ramo do not agree on whether it was a burlap bag or a gym bag that was transferred between cars, (2) Broderick and Ramo made prior inconsistent statements with regard to this evidence before the Flynn trial, (3) Flynn presented three eyewitnesses placing him at home at the time the alleged transfer took place and (4) two eyewitnesses saw dynamite in the trunk of Broderick's car a week before the Faheen bombing. In light of our ruling on insufficiency of evidence, we do not specifically address these contentions.

found in Broderick's testimony. On direct examination, he testified that Flynn said he obtained the dynamite from "Ski across the river." On cross-examination, Broderick testified that Flynn said, "I got the stuff [dynamite] from across the river from Ski." Ski was identified as Stanley Kowalski who lived in Belleville, Illinois, across the Mississippi River from St. Louis.

The Government argues that it is a reasonable inference from this evidence that Ski carried explosives from Illinois to Missouri. We do not agree. While it may be a reasonable inference that Flynn obtained the dynamite from Ski who lived in Illinois, no testimony links Ski to obtaining the dynamite across the river in Illinois or a state other than Missouri. The Government presented no evidence of the place of origin of the explosive. Under these circumstances, where the Government failed in its proof of interstate transportation of the dynamite, the conviction rests only on surmise or conjecture and it cannot stand. The evidence presented must be deemed so insufficient that a reasonably minded jury must have had a reasonable doubt as to the existence of an essential element of the crime. *See United States v. Adkins*, 842 F.2d at 212 (8th Cir.1988).

## VI. CONCLUSION

In accordance with the foregoing, we affirm Flynn's RICO convictions, counts I and II, and reverse his conviction and vacate his sentence on count III.

WOLLMAN, Circuit Judge, concurring in part, dissenting in part.

I concur in Parts II, III, and IV of the majority opinion.

I respectfully dissent from Part V of the majority opinion. I would hold that the evidence was sufficient to convict Flynn of interstate transportation of dynamite in violation of 18 U.S.C. § 844(d). Once it accepted as true Broderick's testimony that Flynn had obtained the dynamite from "Ski across the river," and "from across the river from Ski," the jury could reasonably find that the dynamite had been moved in interstate commerce. Our task is to view the evidence in the light most favorable to the verdict, giving the government the benefit of all reasonable inferences. *United States v. Long Elk*, 805 F.2d 826, 829 (8th Cir.1986). I cannot agree with the majority that a reasonably minded jury must have been left with a reasonable doubt regarding the interstate transportation of the dynamite. *Cf. United States v. Minor*, 815 F.2d 472 (8th Cir.1986).