**NATIONAL ORGANIZATION FOR WOMEN, INC., Delaware Women's Health Organization, Inc., and Summit Women's Health Organization, Inc., et al., Plaintiffs,**

**v.**

**Joseph M. SCHEIDLER, John Patrick Ryan, Randall A. Terry, Andrew Scholberg, Conrad Wojnar, Timothy Murphy, Monica Migliorino, Vital–Med Laboratories, Inc., Pro–Life Action League, Inc., Pro–Life Direct Action League, Inc., Project Life, and Operation Rescue, Defendants.**

No. 86 C 7888.

United States District Court,
N.D. Illinois, E.D.

May 28, 1991.

Fay Clayton, Robinson, Curley & Clayton, Chicago, Ill., Patricia Ireland, NOW, Washington, D.C., Judi Lamble, Jack Block, Sachnoff & Weaver, Chicago, Ill., Alan M. Pollack, Pollack & Greene, New York City, for plaintiffs.

Timothy Belz, Belz & Beckemeier, St. Louis, Mo., Lawrence Gavin, Bell, Boyd & Lloyd, David Loughnane, Charles Redden, Pretzel & Stouffer, Thomas Brejcha, Abramson & Fox, Timothy Klenk, Jerome Bowman, Pope, Ballard, Shepard & Fowle, Ltd., Ann–Louise Lohr, AUL, Robert S. Harlib, Chicago, Ill., Vincent P. McCarthy, New Milford, Conn., Craig Parshall, Menomonee Falls, Wis., Jennifer Craigmile Neubauer, Winnetka, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

HOLDERMAN, District Judge:

Plaintiffs National Organization for Women ("NOW") and two women's health centers brought this action against various antiabortion activists, antiabortion organizations, and a pathology testing laboratory alleging that defendants conspired to drive women's health centers that perform abortions out of business through a pattern of concerted, unlawful activity in violation of the Sherman Antitrust Act, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and several pendent state claims.

In furtherance of the conspiracy, plaintiffs' second amended class action complaint alleges, *inter alia*, that defendants threatened and intimidated clinic personnel and patients, trespassed on clinic property, invaded clinics and damaged clinic equipment, blocked ingress and egress to clinics, destroyed clinic advertising, coordinated telephone campaigns to tie up clinic lines,

set up appointments under false pretenses to keep legitimate patients from making appointments, and established competing pregnancy testing and counseling facilities in the vicinities of the clinics.

Defendants Joseph Scheidler, Andrew Scholberg, Timothy Murphy, and the Pro-Life Action League, Inc. filed a motion to dismiss plaintiffs' second amended complaint for failure to state a claim upon which relief may be granted. For the reasons stated below, the motion is granted in part and denied in part.

## DISCUSSION

### I. COUNT I: SECTION ONE OF THE SHERMAN ANTITRUST ACT

█ Count I of plaintiffs' complaint alleges that defendants Scheidler, Ryan, Terry, Scholberg, Murphy, Wojnar, Migliorino, PLAL, PDAL, Operation Rescue, Project Life, and Vital–Med have restrained trade in violation of section one of the Sherman Act, 15 U.S.C. § 1. Defendants argue that the objective of their activities is "closing clinics by affecting public opinion, consumers' choices, physicians' revulsion, and legislators' votes," and "to convince others for non-economic reasons that the entire private abortion market ought to be banned, or 'decommodified.'" (Mem. in Support, pp. 13, 24.) Defendants assert that their activity "is non-economic but social, moral and political." (*Id.* at 24.)

The threshold question is whether the Sherman Act was intended to cover the conduct alleged here. Given the unique issue presented by this case, guidance can be gleaned from an examination of United States Supreme Court cases concerning the application of antitrust laws to anticompetitive political conduct.

In *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), the Supreme Court held that concerted efforts to restrain or monopolize trade in order to petition government officials are protected from antitrust liability. In *Noerr*, the defendant railroads engaged in a publicity campaign with the purpose of fostering the adoption and retention of laws that would be destructive of the trucking business. *Id.* 81 S.Ct. at 527. The Court characterized the publicity campaign as political activity and held that the "proscriptions of the [Sherman] Act, tailored as they are for the business world, are not at all appropriate for application in the political arena." *Id.* at 531. The Court refused to extend the Act to regulate political activities simply because they "have a commercial impact and involve conduct that can be termed unethical." *Id.* Significantly, the Court pointed out the "essential dissimilarity" between the publicity campaign and "agreements traditionally condemned by § 1 of the [Sherman] Act." *Id.* at 529.

*Noerr* immunity has been most recently discussed by the Supreme Court in *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988) and *F.T.C. v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 110 S.Ct. 768, 769, 107 L.Ed.2d 851 (1990) (hereinafter *"D.C. Lawyers"*). In *Allied Tube*, members of the steel industry packed an annual meeting of a private standard-setting association with new members solely to vote against a new type of electrical conduit that posed an economic threat to steel conduit. 108 S.Ct. at 1934–35. The Court found that the *Noerr* doctrine can immunize indirect as well as direct petitioning of the government. *Id.* at 1938. Applying *Noerr*, the Court focused on the context and nature of the anticompetitive behavior. The Court compared the conduct at issue with conduct classically condemned by the Sherman Act. The Court denied petitioner the use of *Noerr* immunity because petitioner's activity was the type of commercial activity that has traditionally had its validity determined by the antitrust laws themselves. *Id.* at 1939. Unlike *Noerr*, the behavior was not political activity that has traditionally been regulated with extreme caution or activity that bears little if any resemblance to the combinations normally held violative of the Sherman Act. *Id.* at 1940.

The most recent Supreme Court case on *Noerr* immunity confirms the pivotal role that traditional anticompetitive conduct

plays in the doctrine's application. In *D.C. Lawyers,* 493 U.S. 411, 110 S.Ct. 768, 769, 107 L.Ed.2d 851 (1990), a group of lawyers in private practice who regularly acted as court-appointed counsel for indigent defendants in District of Columbia criminal cases agreed to stop providing such representation until the District increased group members' compensation. The Court held that the agreement was a boycott that "constituted a classic restraint of trade within the meaning of Section 1 of the Sherman Act." *Id.* 110 S.Ct. at 774. The horizontal agreement between the lawyers, who were in competition with one another prior to the boycott, constituted a "constriction of supply [which] is the essence of price fixing ... [and] ... was unquestionably a 'naked restraint' on price and output." *Id.* at 774–75. Once again, the Court's denial of *Noerr* immunity was based on its classification of the agreement as "classic" anticompetitive conduct as distinguished from political activity.

The court finds great similarity between this case and another case to which NOW was a party. *State of Missouri v. Nat'l Organization for Women, Inc.,* 620 F.2d 1301 (8th Cir.1980), involved a convention boycott organized by NOW against all states that had not ratified the proposed Equal Rights Amendment. The court asked whether Congress intended to protect free and fair competition from political or social activities that can have the same effect upon competition as the commercial activities of a trust against a business. *Id.* at 1305. After a thorough analysis of the legislative history of the Sherman Act, the court concluded that it was anticompetitive conduct with commercial objectives that Senator Sherman had in mind as the concern of the bill, not anticompetitive conduct by noncompetitors motivated by noneconomic concerns. *Id.* at 1309. The Eighth Circuit in *State of Missouri* performed an equally thorough study of the relevant case law, the results of which confirmed the court's earlier conclusion that the Sherman

Act was intended to regulate anticompetitive conduct that has financial, economic, or commercial objectives. *Id.* at 1313. The court found that, although NOW's boycott was an economic device, it was used in a non-competitive political arena in order to influence legislation and, as such, is not proscribed by the Sherman Act. *Id.* at 1315.

Similarly, a woman's right to have an abortion is a social or political issue—one of the most complex and contentious in American society today. The parties each have clear and loudly publicized views on the issue of abortion. Defendants' actions are not financially or commercially motivated. Defendants have an ultimate objective—legislation prohibiting abortions—and an intermediate goal—injury to abortion clinics. The intermediate goal is one of inflicting economic harm with the hope of achieving the ultimate objective. The intended harm to the relationships between the clinics and their customers parallels the intended injury to the relationship in the *Noerr* case itself between the truckers and their customers. Since the injurious restraint is incidental to a valid effort to influence governmental action, the activity enjoys antitrust immunity even if unethical and deceptive methods have been used. *See Allied Tube,* 108 S.Ct. at 1936–37. Congress has traditionally exercised extreme caution in legislating with respect to problems relating to the conduct of political activities. *Noerr,* 81 S.Ct. at 531. All of this caution would go for naught if this court permitted an extension of the Sherman Act to regulate the activities at issue simply because those activities have a commercial impact and involve conduct that can be termed unethical. *See id.*

■ Furthermore, unlike traditional antitrust matters (such as the situations presented in *Allied Tube* and *D.C. Lawyers*), the activities alleged here are not between competitors.[1] *Allied Tube* con-

---

1. In paragraph two of the complaint, plaintiffs allege that the parties are competitors in commerce. Plaintiffs state that defendants "established competing pregnancy testing and counsel-

ing facilities in the vicinities of the clinics, sometimes in the same buildings where clinics are located, homes for pregnant women and, on information and belief, prenatal and delivery

cerned an agreement between competitors in the conduit industry. *D.C. Lawyers* involved an agreement between competing attorneys. Even in *Noerr,* where immunity was granted, there was an agreement between commercial competitors in the long-distance freight hauling business. Here, as in *State of Missouri,* none of the parties are commercial competitors. The "essential dissimilarity" between the alleged conduct and the conduct traditionally regulated by antitrust laws is of a greater magnitude in this case than that in *Noerr* itself. Thus, the Supreme Court's reasons in *Noerr* for not applying antitrust laws apply with greater weight to this case, which involves political opponents, not commercial competitors, and political objectives, not marketplace goals.

For these reasons, the Court finds that the Sherman Act does not apply to the defendants' anticompetitive actions alleged in the complaint. Accordingly, Count I must be dismissed.

## II. RICO COUNTS

### A. SECTION 1962(a)

■ Count II of plaintiffs' complaint alleges a violation of 18 U.S.C. § 1962(a), which makes it

> unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise. . . .

Plaintiffs allege that defendants received contributions in support of their racketeering activities and that defendants invested that income in the various defendant organizations to further the illegal goals of the organizations. (Complaint, ¶¶ 100–104).

In order to state a claim under § 1962(a), income must be "derived, directly or indirectly, from a pattern of racketeering activ-

ity." Plaintiffs claim that the donations received from defendants' supporters were derived from defendants' illegal acts. Plaintiffs state that "[i]t is well-known that the more outrageous and highly-publicized the activities are, the more likely the RICO Defendants and the enterprises are to receive large donations." (RICO Case Statement, p. 22.) The court believes that the receipt of donations from supporters of the defendant organizations does not constitute income derived from a pattern of racketeering activity. The racketeering activity alleged in the complaint is extortion. The extortion was addressed, either directly or indirectly, at clinics and employees and patients of those clinics. Supporters of defendant organizations were not extorted, either directly or indirectly, into contributing to the organizations. While supporters may have contributed in order to promote the extortionate activities of defendants, their contributions in no way were derived from the pattern of racketeering alleged in the complaint. *See Hemmings v. Barian,* 822 F.2d 688, 692 (7th Cir.1987) (§ 1962(a) claim fails because the income received was not derived from the racketeering activity alleged in the complaint, but instead was income from sources that were proper and aboveboard). Thus, plaintiffs' RICO claim under § 1962(a) must fail.

### B. SECTION 1962(c)

Count III of plaintiffs' complaint alleges a violation of 18 U.S.C. § 1962(c). A violation of § 1962(c) requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). In addition, the plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation of § 1962(c). *Id.*

Defendants contend that RICO requires that the predicate acts or the enterprise be

---

services, foster homes and private adoption agencies." Although Fed.R.Civ.P. 8(a) requires only "a short and plain statement of the claim," this obscure reference to commercial competition between the parties is the sole allegation in the complaint of the commercial nature of defendants' activities. As such, it does not constitute the "plain" statement necessary to provide notice and state a claim for relief under the Sherman Act.

economically motivated. The circuits which have explicitly addressed this issue are in conflict on the need for an economic motive. As noted by Justice White, the Second and Eighth Circuits require a profit-making element, while the Third Circuit does not. *McMonagle v. Northeast Women's Center, Inc.,* — U.S. ——, 110 S.Ct. 261, 107 L.Ed.2d 210 (1989) (denial of petition for writ of certiorari) (White, J., dissenting).

The Second Circuit has held that either the predicate acts of racketeering or the enterprise must have some financial motive. *United States v. Ferguson,* 758 F.2d 843, 853 (2d Cir.1985); *United States v. Bagaric,* 706 F.2d 42, 55 (2d Cir.1983); *United States v. Ivic,* 700 F.2d 51, 65 (2d Cir.1983). However, the economic motive need not surmount all other motives. *Bagaric,* 706 F.2d at 55.

In *Ivic,* the Second Circuit held that subsection 1962(c) has an economic motive requirement. *Id.* at 60. The court discussed the use of the term "enterprise" in 1962(a) and (b),[2] concluding that "the term 'enterprise' [in subsections (a) and (b)] quite clearly refers to ... the sort of entity which one joins to make money.... [A]n 'enterprise', as used in these subsections, is evidently an organized profit-seeking venture." *Id.* The court adhered to the rule that when the same word is used in the same section of an act more than once, and the meaning is clear in one place, it will be assumed to have the same meaning in other places. *Id.* Thus, the court found a requirement for a profit-generating motive in subsection (c).

The Eighth Circuit has also held that an enterprise must be directed toward an economic goal. *United States v. Flynn,* 852 F.2d 1045, 1052 (8th Cir.1988); *United States v. Anderson,* 626 F.2d 1358, 1372 (8th Cir.1980). In *Anderson,* the Eighth Circuit stated:

We hold that Congress intended the phrase 'a group of individual's associated

in fact although not a legal entity,' as used in its definition of the term 'enterprise' in section 1961(4), to encompass only an association having an ascertainable structure *which exists for the purpose of maintaining operations directed toward an economic goal* that has an existence that can be defined a part from the commission of the predicate acts constituting the 'pattern of racketeering.'

*Anderson,* 626 F.2d at 1372 (emphasis added). The court in *Anderson* set forth this economic goal requirement as part of its discussion of a distinct enterprise requirement. Although the court did not fully explain the reason for the economic goal requirement, the court earlier determined that, as the Second Circuit did in *Ivic,* the meaning of "enterprise" in subsection 1962(c) is the same as in subsections 1962(a) and (b). *Id.* 626 F.2d at 1366 n. 12.

In *Flynn,* the Eighth Circuit was directly faced with the issue of an economic motive requirement in RICO. The court relied on *Anderson* and *Ivic* when it held that an enterprise must be directed toward an economic goal. *Flynn,* 852 F.2d at 1052. In finding this requirement met, the court noted that the members of the enterprise directed their activities toward controlling St. Louis labor unions, thereby enhancing their own finances and influence. *Id.*

In *Northeast Women's Center, Inc. v. McMonagle,* 868 F.2d 1342 (3d Cir.1989), the Third Circuit focused on the need for an economic motive in a RICO claim that was predicated on violations of the Hobbs Act. In *McMonagle,* a women's health center brought a RICO action against antiabortionist activists for intimidation and harassment of the center's employees and activities. The court held that since no economic motive is necessary under the Hobbs Act, no economic motive is required when the Hobbs Act is used as a predicate under RICO. *Id.* at 1350. Thus, the Third Circuit avoided the question of whether an

---

**2.** Section 1962(a) makes it unlawful to use funds derived from a pattern of racketeering or from the collection of an unlawful debt to acquire an interest in or to establish or operate an enterprise engaged in or affecting interstate or foreign commerce. Section 1962(b) makes it unlawful to acquire or maintain an interest in or control of an interstate enterprise through a pattern of racketeering activity or through collection of an unlawful debt.

economic motive was required under the RICO statute itself.

The Seventh Circuit has not directly addressed the issue of an economic motive requirement in RICO. However, in *United States v. Neapolitan*, 791 F.2d 489, 500 (7th Cir.1986), the Seventh Circuit adopted the Eighth Circuit's definition of "enterprise" found in *Anderson*.[3] Two district judges of the Northern District of Illinois in published opinions have also adopted the *Anderson* definition of enterprise. *See Uniroyal Goodrich Tire Co. v. Mutual Trading Corp.*, 749 F.Supp. 869, 877 (N.D. Ill.1990) (Aspen, J.); *United States v. Walters*, 711 F.Supp. 1435, 1448 (N.D.Ill.1989) (Marovich, J.).

██ In light of the reasoned opinions of the Second Circuit concerning the RICO economic motive requirement, the similar holding of the Eighth Circuit, the questionable reasoning by the Third Circuit, and the Seventh Circuit's apparent adoption of the economically-motivated "enterprise" definition, this court holds that an economic motive requirement exists to the extent that some profit-generating purpose must be alleged in order to state a RICO claim.[4]

The Second Circuit's opinions in *Ivic, Bagaric*, and *Ferguson* provide three different factual situations which demonstrate the Second Circuit's application of the economic motive requirement. In *Ivic*, defendants were Croatian activists who were committed to achieving independence for their homeland. *Ivic*, 700 F.2d at 53. The indictment charged that the "primary object" of the criminal enterprise was to "use terror, assassination, bombings, and violence in order to foster and promote their beliefs and in order to eradicate and injure persons whom they perceived as in opposition to their beliefs." *Id.* at 58.

When the court applied the economic motive requirement to the facts, the court found the requirement unmet:

Defendants joined together not to make money but ... to advance the goal of Croatian independence. They undertook to murder Badurina and to bomb the dance studio and the travel agency not to obtain money, but rather to eliminate political opponents, win publicity, or otherwise further their chosen cause.

*Id.* at 60–61. In a footnote, the court distinguished these facts from cases where terrorist organizations have engaged in robbery or extortion to obtain money to further their activities. *Id.* at 61 n. 6.

In *Bagaric*, the government charged members of a Croatian terrorist group with the predicate acts of extorting money from unsympathetic Croatians in order to provide financial support for their other illegal activities. *Bagaric*, 706 F.2d at 46–52. The court found that the predicate acts were "classic economic crime[s]" that

---

**3.** This court recognizes that the Seventh Circuit in *Neapolitan* was discussing the requirement for the existence of a RICO enterprise separate from a RICO conspiracy, and was not directly addressing the existence of an economic motive requirement. However, by adopting the definition of "enterprise" from *Anderson in toto*, the Seventh Circuit appears to have approved the requirement that a RICO "enterprise" must exist "for the purpose of maintaining operations directed toward an economic goal." 791 F.2d at 500.

**4.** Plaintiffs assert that defendants' "activities. have decreased the business of, and/or increased the cost of doing business at ... clinics." (Complaint, ¶ 105.) The business injuries include increased cost for laboratory services, increased insurance costs for clinics, increased costs for security guards, increased costs for rental space, lost business, and general harassment. (RICO Case Statement, ¶ 15.) The three

cases from the Second Circuit and the two cases from the Eighth Circuit discussed herein approach the economic motive requirement as whether the enterprise or pattern of racketeering was profit-generating, and not whether they were cost-enhancing. In fact, the Second Circuit's opinion in *Ivic*, relied on by the Eighth Circuit in *Flynn*, clearly states that a RICO enterprise "is evidently an organized profit-seeking venture." *Ivic*, 700 F.2d at 60. In finding that the government had not met the economic motive requirement, the court determined that the "[d]efendants joined together not to make money." *Id.* No case applying the RICO economic motive requirement has discussed an increase in costs incurred by a plaintiff resulting from a defendant's conduct as a way to meet the requirement. Therefore, this court interprets the economic purpose requirement as an intent by the defendant to generate financial gain for the defendant, and not as an intent by the defendant to increase costs incurred by the plaintiff.

"were carried out either to compel payment or in retaliation for refusal to meet appellants' extortionate demands." *Id.* at 58. The government's case involved the extortion of money from "moderate Croatians" to help finance defendants' criminal enterprise. *Id.*

Similarly, in *Ferguson*, the Second Circuit allowed a RICO prosecution against members of the Black Liberation Army who were charged with predicate acts including armored truck robberies and the use of stolen money to maintain safe houses and to support members of the group. *Ferguson*, 758 F.2d at 853. The court emphasized that, unlike *Ivic*, "the defendants' activities centered around the commission of economic crimes" including ten robberies and attempted robberies of armored trucks in order to obtain money to further their activities. *Id.*

■ Of the three Second Circuit cases, the instant case is most analogous to *Ivic*. According to plaintiffs' pleadings, the primary objective of the alleged enterprise and its pattern of predicate acts was to drive clinics that perform abortions out of business.[5] While plaintiffs do allege that defendants received monetary benefits from the enterprise in the form of voluntary donations from supporters, this does not meet the level of economic motivation set out by the Second Circuit. In both *Bagaric* and *Ferguson*, the court found that "some financial purpose" existed. The court reasonably labeled the predicate acts of extortion of money, in *Bagaric*, and armored truck robberies, in *Ferguson*, as "economic crimes." In both of these cases, the predicate acts were crimes in which the necessary goal was to obtain money. The money was then to be used to further the central activities of the enterprise.

Here, defendants alleged acts were directed, as in *Ivic*, toward "eradicat[ing] and injur[ing] persons whom they perceived as in opposition to their beliefs." *See Ivic*,

700 F.2d at 58. The motivation for destroying clinic property, threatening clinic employees, and blocking access to clinics, among other alleged acts, was not to obtain money, but rather to otherwise further their antiabortion cause by limiting the availability of abortion services and winning publicity for their cause. The fact that such activity may have also resulted in an increase in voluntary donations to the enterprise is not sufficient to allege the economic motivation requirement of RICO.

The economic motive requirement would lose all meaning should the courts consider an enterprise to be economically motivated solely because that enterprise happens to receive voluntary donations to support the continuation of racketeering activities directed toward a non-financial objective. If this were the case, a plaintiff in a RICO action could meet the economic motive requirement simply by alleging that the defendant sought to receive some voluntary financial support from bystanders harboring sympathy for the defendant's pattern of racketeering activities and that the defendant was motivated by the possibility of gaining financially from the voluntary contributions of those sympathizers during the course of the activities. This result is nonsensical, and the court refuses to adopt it.

## C. SECTION 1962(d)

Count IV alleges a RICO claim under 1962(d). Section 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section." Since plaintiffs' claims under sections 1962(a) and (c) cannot stand, plaintiffs' section 1962(d) claim must also fail.

## III. PENDENT STATE CLAIMS

■ Having dismissed the federal claims in plaintiffs' complaint, all that remains are pendent state law claims. The general rule is that the court should relinquish jurisdiction over any pendent state law claim when

---

5. *See, e.g.*, Second Amended Complaint, ¶¶ 1, 3, 26, 27, 28, 29, 30, 96; RICO Case Statement, ¶ 2, 3, 5(f)(2), 5(g), 8. As stated in the RICO Case Statement, "[t]he predicate acts ... are related in that they have been organized and executed

... to further the enterprises' goal of closing through extortionate acts, all women's health centers that provide abortion services." (¶ 5(g).)

the federal claims are dismissed before trial. *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). Accordingly, the court dismisses the pendent state claims.

## CONCLUSION

For these reasons, defendants' motion to dismiss Count I (under the Sherman Act) and Counts II—IV (under RICO) of plaintiffs' second amended class action complaint is GRANTED. Due to lack of pendent jurisdiction, Counts V—VII of the complaint are DISMISSED. This case is dismissed in its entirety. All pending motions, except for plaintiffs' pending motion to enter final judgment on attorneys' fees, are moot.