968 F.2d 612
 61 USLW 2037, 1992-1 Trade Cases P 69,884,
RICO Bus.Disp.Guide 8033
 NATIONAL ORGANIZATION FOR WOMEN, INC., on behalf of itself
and its women members and other women who use or may use the
services of women's health centers that provide abortions,
Delaware Women's Health Organization, Incorporated and
Summit Women's Health Organization, Incorporated, on behalf
of themselves and all other similarly situated clinics,
Plaintiffs-Appellants,
v.
Joseph M. SCHEIDLER, John P. Ryan, Randall A. Terry, Andrew
Scholberg, Conrad Wojnar, Timothy Murphy, Monica Migliorino,
Vital-Med Laboratories, Inc., Pro-Life Action League, Inc.,
Pro-Life Direct Action League, Inc., Project Life, and
Operation Rescue, Defendants-Appellees.
 No. 91-2468.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 19, 1992.
Decided June 29, 1992.
Rehearing and Rehearing En Banc Denied Aug. 4, 1992.
 
 Jack L. Block, Lowell E. Sachnoff, Judi A. Lamble, Sachnoff & Weaver, Chicago, Ill., Robert J. Lerner, Perry, Lerner & Quindel, Milwaukee, Wis., Fay Clayton (argued), Susan Valentine, Robinson, Curley & Clayton, Patricia Ireland, Kim Gandy, National Organization for Women, Inc., Washington, D.C., Sharon Thompson, Durham, N.C., Alan Pollack, Pollack & Greene, New York City, for plaintiffs-appellants.
 Edward Grant, Hinshaw & Culbertson, Thomas L. Brejcha, Jr. (argued), Abramson & Fox, Robert S. Harlib, Clarke D. Forsythe, Ann-Louise Lohr, Kevin J. Todd, Americans United for Life Legal Defense Fund, Jerome K. Bowman, Timothy C. Klenk (argued), Pope, Ballard, Shepard & Fowle, Chicago, Ill., Timothy Belz, Belz & Beckemeier, St. Louis, Mo., Vincent P. McCarthy, New Milford, Conn. (argued), Jennifer C. Neubauer, Winnetka, Ill., Philip R. King, Tribler & Orpett, Chicago, Ill., Craig Parshall, Jaeger, Parshall & Umpletz, Menomenee Falls, Wis., Robert M. Chemers, Scott O. Reed, David J. Loughnane, Charles F. Redden, Pretzel & Stouffer, Chicago, Ill., Lawrence Gavin, Bell, Boyd & Lloyd, Chicago, Ill., Thomas P. Monaghan, Monaghan & Sekulow, New Hope, Ky., for defendants-appellees.
 Kimball R. Anderson, Winston & Strawn, Roslyn C. Lieb, Cynthia A. Wilson, Chicago Lawyers' Committee, Chicago, Ill., for Chicago Abortion Fund, and Coalition of African-American Women for Choice, amicus curiae.
 Stephen F. Ross, University of Illinois, College of Law, Champaign, Ill., for American College of Nurse-Midwives, and American Medical Students Ass'n, amicus curiae.
 Thomas W. Strahan, John W. Whitehead, Charlottesville, Va., for Rutherford Institute, amicus curiae.
 Before BAUER, Chief Judge, CUMMINGS, Circuit Judge, and VAN SICKLE, Senior District Judge.[1]
 BAUER, Chief Judge.
 
 
 1
 The plaintiffs, the National Organization for Women, Inc. ("NOW"), the Delaware Women's Health Organization, Inc. ("DWHO"), and Summit Women's Health Organization, Inc. ("SWHO"), brought this action seeking federal relief from the defendants' nationwide campaign to close medical clinics that provide abortion services. The second amended complaint[2] alleges violations of the Sherman Antitrust Act, 15 U.S.C. § 1, and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(a), (c), and (d) ("RICO"). The complaint also raises several pendent state claims. The district court granted the defendants' motion to dismiss the complaint under F.R.C.P. 12(b)(6). National Organization for Women v. Scheidler, 765 F.Supp. 937, 945 (N.D.Ill.1991).
 
 
 2
 The plaintiffs appealed. We reluctantly affirm the dismissal of the plaintiffs' claims for two reasons. First, we find that the antitrust laws were not intended to apply to the defendants' activities. Second, we hold that RICO requires either an economically motivated enterprise or economically motivated predicate acts.I. FACTUAL BACKGROUND
 
 
 3
 The plaintiffs (a national non-profit organization aimed at advancing and protecting women's rights, and two women's health centers[3]), claim that the defendants, anti-abortion activists, anti-abortion groups, and a medical testing laboratory, engaged in a conspiracy to close all women's health centers providing abortions through a pattern of illegal activity. The complaint alleged that the defendants (other than Vital-Med Laboratories) engaged in the following illegal[4] activities in order to close women's health centers that perform abortions: extortion; physical and verbal intimidation and threats directed at health center personnel and patients; trespass upon and damage to center property; blockades of centers; destruction of center advertising; telephone campaigns designed to tie up center phone lines; false appointments to prevent legitimate patients from making them; and direct interference with centers' business relationships with landlords, patients, personnel, and medical laboratories.[5] Many of these activities were organized by a coalition of anti-abortion groups called the Pro-Life Action Network ("PLAN"). The defendants who have participated in PLAN activities, the "PLAN defendants" are Scheidler, Ryan, Terry, Scholberg, Murphy, Wojnar, Migliorino, Pro-Life Action League ("PLAL"), Pro-Life Direct Action League ("PDAL"), Operation Rescue ("OR"), and Project Life.
 
 
 4
 More specifically, the complaint alleges that defendant Scheidler distributes Closed: 99 Ways to Stop Abortion, a manual which advocates unlawful methods of interfering with the operations of women's health centers. Employing the methods detailed in the manual, defendants Scheidler, Ryan, Terry, Scholberg, Murphy, and Migliorino have spearheaded actions throughout the country aimed at closing health centers. For example, in March 1986, Scheidler, Ryan, PLAL, and PDAL, led others (alleged to be their co-conspirators) in an invasion of a health center in Florida. Protestors entered the center, and injured the center's administrator and another woman, the medical procedures room was ransacked, and medical supplies were destroyed. The participants who stormed the center were convicted on criminal charges.
 
 
 5
 Other demonstrations organized by defendants involved hundreds of individuals who blockaded clinics. During these "blitzes," as they are called, defendants' groups, using a method called "lock and block," pour glue into clinic locks, and individual protestors lock themselves to clinic doors. Another tactic involves abrasive confrontations with women seeking abortions, designed, according to a news release prepared by defendants, to take away the centers' business. The complaint details many other invasions of clinics, and in one case, a judge's home, involving injuries, trespass, and vandalism. Often these demonstrations resulted in the arrests of hundreds of demonstrators, including defendants, for state criminal law violations. For example, defendant Ryan has been arrested more than three hundred times; defendant Scheidler has been convicted and fined for criminal trespass and harassment. We note that the complaint does not purport to catalog all of the defendants' arrests and criminal convictions.
 
 
 6
 The plaintiffs also allege that two of the defendants (Wojnar and Terry) have established competing pregnancy testing and counseling facilities.
 
 
 7
 Defendant Vital-Med Laboratories, an Illinois corporation, provided pathology testing and safe, sanitary disposal services to DWHO, SWHO, and other affiliated clinics. Plaintiffs allege that Vital-Med participated in a conspiracy to steal fetal remains from Vital-Med's Northbrook, Illinois laboratory. In January 1988, defendant Wojnar was contacted by a Vital-Med employee who detailed a scheme for stealing fetal remains from the laboratory. Over a ten-month period, in conspiracy with one or more Vital-Med employees, defendants Murphy and Migliorino stole approximately 4,000 aborted fetuses from the laboratory. Murphy and Migliorino each entered Vital-Med's Northbrook laboratory, opened sealed storage drums containing a variety of medical waste, and removed fetal specimens. On at least one occasion, an entire storage drum was stolen. Vital-Med employees, who saw Murphy and Migliorino on at least one occasion, did nothing to stop the thefts.
 
 
 8
 The remains were stored at the homes of Scheidler, Murphy, Migliorino, and Wojnar. Scheidler kept the storage drum in a playhouse in his backyard for several weeks. After the fetal remains were removed, Murphy dumped the drum containing the remaining medical waste in a dumpster in Chicago. Remains were sent to anti-abortion activists in Indiana, North Carolina, North Dakota, Delaware, and Florida. Activists eventually held mass burial services for the fetuses in several states. Scheidler announced to news media that the fetuses had been found at a Chicago laboratory and that they were "individually packaged and labelled ... with the names of the mothers, doctors, dates and places the abortions were performed." Second Amended Complaint, R. 236 at 24. Vital-Med no longer accepts fetal remains for testing.
 
 
 9
 Finally, defendants contacted businesses that provide goods and services to health centers and threatened to disrupt and harass them if they continued to transact business with the centers. When SWHO arranged a move to new premises, defendant Migliorino threatened SWHO's future landlord and co-tenants. The landlord terminated the lease.
 
 
 10
 We note here that the complaint does not attempt to bar all anti-abortion activities. Peaceful picketing, debate, meetings, prayers, and a host of other forms of peaceful protest, are protected by the First Amendment. The complaint seeks relief from criminal and tortious activities such as trespass, clinic invasion, vandalism, extortion, and tortious interference with business relationships.
 
 
 11
 Moreover, the complaint does not allege that the defendants have attempted to influence any governmental actor. There is no allegation that defendants petitioned a court, an administrative agency, an executive officer, or a legislature. Therefore, the district court's conclusion that the defendants' primary objective was to influence legislation is in error. Although the defendants' acts generated publicity which they may have hoped would influence governmental actors, this tangential contact is not sufficient to invoke First Amendment protection for otherwise criminal behavior. See NAACP v. Claiborne Hardware, Inc., 458 U.S. 886, 916, 102 S.Ct. 3409, 3427, 73 L.Ed.2d 1215 (1981).
 
 II. STANDARD OF REVIEW
 
 12
 We review a 12(b)(6) dismissal de novo. Bethlehem Steel Corp. v. Bush, 918 F.2d 1323, 1326 (7th Cir.1990); Sutliff, Inc. v. Donovan Companies, Inc., 727 F.2d 648, 654 (7th Cir.1984). An action may only be dismissed if the complaining party "can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-102, 2 L.Ed.2d 80 (1957) (footnote omitted). We assume all well-pleaded allegations are true and draw all reasonable inferences in the light most favorable to the plaintiff. Summit Health, Ltd. v. Pinhas, --- U.S. ----, ----, 111 S.Ct. 1842, 1845, 114 L.Ed.2d 366 (1991); Bethlehem Steel, 918 F.2d at 1326.
 
 III. ANTITRUST CLAIMS
 
 13
 The Supreme Court has cautioned that summary procedures should be used sparingly in antitrust cases because of the complexities involved. Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 490, 7 L.Ed.2d 458 (1962). Nevertheless, we have noted that "despite its sweeping language, Poller and its progeny simply stand for the proposition that, if a claim under the antitrust laws has been adequately set forth in the complaint, the highly factual and subjective questions of intent and purpose should be resolved after discovery and trial." Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1106 (7th Cir.1984) (citing Havoco of America, Inc. v. Shell Oil Co., 626 F.2d 549, 559 (7th Cir.1980), cert. denied, 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985)). We also note that the treatment of this case has not been precipitous. It was filed on October 17, 1986. After discovery and two amendments to the complaint, the district court dismissed the action May 28, 1991.
 
 
 14
 Although Congress "left no area of its constitutional power [over commerce] unoccupied," when it passed the Sherman Act, it did not intend to outlaw every contract, combination, or conspiracy that restrains trade. Summit, 111 S.Ct. at 1846 n. 10 (quoting United States v. Frankfort Distilleries, Inc., 324 U.S. 293, 298, 65 S.Ct. 661, 663, 89 L.Ed. 951 (1945)). Otherwise every commercial business contract would fall within its prohibition. See Standard Oil Co. v. United States, 221 U.S. 1, 59-69, 31 S.Ct. 502, 515-519, 55 L.Ed. 619 (1911) (despite broad wording, not every form of combination or conspiracy that restrains trade falls within Sherman Act); Marjorie Webster Jr. College v. Middle States Association of Colleges and Secondary Schools, 432 F.2d 650, 653 (D.C.Cir.), cert. denied, 400 U.S. 965, 91 S.Ct. 367, 27 L.Ed.2d 384 (1970); National Society of Professional Engineers v. United States, 435 U.S. 679, 687-88, 98 S.Ct. 1355, 1362-63, 55 L.Ed.2d 637 (1978). But see Goldfarb v. Virginia State Bar, 421 U.S. 773, 787, 95 S.Ct. 2004, 2013, 44 L.Ed.2d 572 (1974) (language of § 1 "contains no exception.... [O]ur cases have repeatedly established that there is a heavy presumption against implicit exemptions.").
 
 
 15
 We generally are reluctant to delve into questions of legislative intent when applying statutes. See West Virginia University Hospitals v. Casey, --- U.S. ----, 111 S.Ct. 1138, 1147-48, 113 L.Ed.2d 68 (1991). The Supreme Court, however, has expressly sanctioned inquiry into the legislative history of the anti-trust laws. See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1976) (examining legislative purpose and history of Clayton Act); Apex Hosiery Co. v. Leader, 310 U.S. 469, 489, 60 S.Ct. 982, 989, 84 L.Ed. 1311 (1939) (interpreting Sherman Act in light of legislative history and "particular evils at which the legislation was aimed.").
 
 
 16
 The Court explained in Apex Hosiery, 310 U.S. at 493, 60 S.Ct. at 992 n. 15, that "[t]he history of the Sherman Act as contained in the legislative proceedings is emphatic in its support for the conclusion that 'business competition' was the problem considered and that the act was designed to prevent restraints of trade which had a significant effect on such competition." For this reason, we question the appropriateness of the Act's application in this case.
 
 
 17
 We believe the Eighth Circuit's analysis of the legislative history of the Sherman Act in State of Missouri v. National Organization for Women, 620 F.2d 1301 (8th Cir.), cert. denied, 449 U.S. 842, 101 S.Ct. 122, 66 L.Ed.2d 49 (1980) ("Missouri v. NOW "), is particularly helpful. In Missouri v. NOW, the National Organization for Women helped organize a convention boycott of all states that had failed to ratify the Equal Rights Amendment. The explicit purpose of the boycott was to put economic pressure on states to ratify the ERA. Missouri sued, arguing that the boycott constituted a restraint of trade in violation of the Sherman Act.[6]
 
 
 18
 The Missouri v. NOW court noted that the legislative debates preceding passage of the Sherman Act indicate that the Act was not intended to reach the activities of organizations espousing social causes. Specifically, the debates indicated a desire to avoid regulating organizations aimed at discouraging the consumption of alcohol. See id. at 1307-08. Indeed, during the debates over the Sherman Act, senators expressed concern about the breadth of the bill, and Senator Sherman sought to allay these fears:
 
 
 19
 George:[7] But yet that is the legal meaning and force of the bill; and I will state to the Senate and to the Senator from Ohio [Sherman] that it is directly within the terms of this bill to forbid any number of persons belonging to or joining a temperance society whose object is to compel retailers of intoxicating liquors to give up their business.
 
 
 20
 Sherman: Where men agree that they will not drink at all, does the Senator think that is a combination in restraint of the trade of liquor-sellers?
 
 
 21
 George: What is it?
 
 
 22
 Sherman: The Senator, as I understand, now claims that an agreement among several people not to drink whisky or brandy is in restraint of the trade of selling whisky or brandy and is therefore a combination within the meaning of this bill?
 
 
 23
 George: I insist that a society, making an agreement or a combination between citizens of a town anywhere in the Union not to drink, not to use in any way vinous or spirituous liquors, and to persuade others to a similar abstention, does, in the language of this bill, tend to compel persons engaged in retailing liquor in that community to give up their business, and the doing of that is expressly condemned by the third section of this bill.
 
 
 24
 Stewart:[8] If an organization for the purpose of having laws passed creating high license is formed, would not that enhance the value of the things prohibited in this bill?
 
 
 25
 George: I have considered that question. I have thought possibly that the courts might say that the right of a political organization to bring about political results by legislation was not embraced within the provisions of the bill.
 
 
 26
 1 Kintner, at 77-79 (quoting 20 Cong.Rec. 1458-59 (February 4, 1889)).
 
 
 27
 The 50th Congress did not pass an antitrust law; nevertheless, as Kintner has noted "these proceedings shed light on Congress' motivation and its assessment of the economic, political, and legal forces which were operating in the country." 1 Kintner, at 15. The 51st Congress passed the antitrust bill in a relatively short time, and debated it for only seven days. Id. at 17. During these debates the Senate again discussed the interaction between the Sherman Act and the temperance movement:
 
 
 28
 Wilson:[9] I desire to offer an amendment to come in at the end of section 1 of the bill, and as an addition to the proviso contained in that section.
 
 
 29
 The Presiding Officer. The Secretary will state the amendment proposed by the Senator from Iowa.The Chief Clerk. It is proposed to add at the end of the second proviso to section 1:
 
 
 30
 Nor to any arrangements, agreements, associations, or combinations among persons for the enforcement and execution of the laws of any State enacted in pursuance of its police powers; nor shall this act be held to control or abridge such powers of States.
 
 
 31
 * * * * * *
 
 
 32
 Hoar:[10] Allow me to ask the Senator if his amendment accomplishes his object. I understand his object is to protect combinations of persons intended to discourage the use and manufacture of intoxicating liquors.
 
 
 33
 Wilson: My object is to exclude them from the operation of the bill.
 
 
 34
 Hoar: I understand, to protect them from being affected by it. But the only description in his amendment is of such associations as are in aid of the execution of the laws of a State in pursuance of its police power. Now, if this bill without his amendment would render the class of persons subject to the penal provision, all temperance societies whose object is to persuade mankind not to use intoxicating liquors would still remain in spite of his amendment within the purview of bill. It seems to me he should extend his amendment a little further, because, as far as my State goes, this class of associations which he has described do not confine their efforts to the execution of the law, but their efforts are a great deal more extensive and extend to discouraging the use or manufacture of intoxicating liquors altogether. This is what he means, and we should all vote for it.
 
 
 35
 Wilson: I am satisfied that my amendment will cover the purpose I have in view concerning my State. If other Senators desire something further in regard to their state, they can move it.
 
 
 36
 Hoar: I move to amend the Senator's amendment by adding to it:
 
 
 37
 Or to discourage the use or manufacture of intoxicating liquors.
 
 
 38
 And we will take a vote on that.
 
 
 39
 The Presiding Officer. The question is on agreeing to the amendment to the amendment.
 
 
 40
 Sherman: The Senator from Iowa showed me his amendment. As these organizations in Iowa are associated and organized something in the nature of a corporation, there might be some reason for believing that they possibly might fall within the clauses of the bill. Therefore, I have no objection to his amendment, but I do not see any reason for putting in temperance societies any more than churches or school-houses or any other kind of moral or educational associations that may be organized. Such an association is not in any sense a combination arrangement made to interfere with interstate commerce; but under the peculiar circumstances, upon the facts stated by the Senator from Iowa, I think it is very proper to make an exception of those organizations in Iowa which are really in aid of the execution of State law. I would apply it to all organizations which are using either moral or any other kind of means for the enforcement of local laws; but I do not think it is worth while to adopt the amendment of the Senator from Massachusetts, because that would include temperance societies. You might as well include churches and Sunday schools.
 
 
 41
 Id. at 250-52 (quoting 21 Cong.Rec. 2658-59 (1890)) (emphasis added).
 
 
 42
 Protests against establishments legally serving liquor were sometimes violent. See Jack S. Blocker, Jr., Give to the Winds Thy Fears: The Women's Temperance Crusade, 1873-1874, 50, 76-77, 197 (1985) (describing violence by protesters and against them). See also Joseph Gusfield, Symbolic Crusade: Status Politics & the American Temperance Movement (2d ed. 1986); Mother Stewart, Memories of the Crusade, A Thrilling Account of the Great Uprising of the Women of Ohio in 1873, Against the Liquor Crime (1972). Temperance "crusaders" as they were sometimes called, "physically attacked saloons, sometimes with hatchets, hammers, and other tools, destroying the stock of liquor and perhaps the furnishings as well." Blocker, at 50.
 
 
 43
 Other crusaders contented themselves with "peaceful" invasions, wherein they would descend en masse to pray and plead with druggists and saloon keepers to stop selling liquor. They also "stationed one or two women at each dealer's door, to plead with or simply embarrass those seeking to enter." Id. at 48. Often large numbers of crusaders would march on recalcitrant liquor sellers. A violent scuffle ensued when 100 crusaders descended upon a tavern in Columbus, Ohio. Id. at 197. Thirty entered the tavern and refused to leave, and the owner called the police. Before police arrived, one of the women crusaders fought with the proprietor and his wife. Although they left the premises when asked by the police, crusaders continued to picket the establishment. Id. To provide potential drinkers with a social alternative to the saloon, crusaders set up reading rooms and coffee houses. They offered such establishments in at least twenty locations in six states. Id. at 50. The violence surrounding the temperance movement was well-publicized, and legislators were undoubtedly aware of the crusaders' activities. See, e.g., Mother Stewart, Memories of the Crusade, 98-101 (1972) (discussing press coverage of crusaders' activities).
 
 
 44
 Commentators have pointed out the parallels between the modern-day anti-abortion protests and the temperance movement. "One is drawn to recall slavery and prohibition as the historical analogues to this controversy." Elizabeth Mensch & Alan Freeman, The Politics of Virtue: Animals, Theology and Abortion, 25 Ga.L.Rev. 923, 926 (1991). Indeed, the parallels are striking. Defendants here have entered clinics violently, assaulted personnel, and destroyed medical supplies. They lead large groups of protesters to health centers to persuade center staff to stop performing abortions. They confront patients and plead with them not to enter the centers. Wojnar and Terry have established "pro-life" pregnancy counseling centers, which like the temperance crusaders' coffee houses, purport to provide an alternative for the centers' services.
 
 
 45
 While the language of the congressional debates is not unequivocal, like the court in Missouri v. NOW, we believe it provides a fair indication that Congress did not intend to reach every activity that might effect business. As the Senator from Massachusetts remarked, even temperance organizations that went beyond the execution of state laws in discouraging people from consuming liquor were not to be covered by the Act. Sherman's comments mitigate this conclusion somewhat, because he discusses only those organizations attempting to bolster the execution of state laws.
 
 
 46
 Some of these comments foreshadow the development of the Noerr- Pennington doctrine, which protects businesses' and other associations' efforts to obtain a governmental imposition of a trade restraint. United Mine Workers of America v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); Lawline v. American Bar Association, 956 F.2d 1378 (7th Cir.1992). But, as we pointed out in our discussion of the background facts, the plaintiffs do not complain about petitioning. "The doctrine does not ... protect purely private action not genuinely aimed at prompting governmental action." Wilk v. American Medical Association, 895 F.2d 352, 357 (7th Cir.1990). Cf. Vietnamese Fishermen's Association v. Knights of the Ku Klux Klan, 518 F.Supp. 993 (1981) (Noerr does not protect attempt to eliminate a class of competitors--other fishermen--using violence, threats, vandalism).
 
 
 47
 Other cases successfully invoking the doctrine's protection have alleged in the complaint the petitioning activity. California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1971) (state and federal administrative proceedings to bar plaintiffs' entry into trucking market); Pennington, 381 U.S. at 657, 85 S.Ct. at 1585 (influencing Secretary of Labor to enact labor standards); Noerr, 365 U.S. at 127, 81 S.Ct. at 523 (false publicity campaign to convince legislators and governor to enact legislation harmful to competitors); Lawline v. American Bar Association, 956 F.2d 1378 (7th Cir.1992) (lobbying state to adopt ethical rules). Because the defendants' acts are far removed from the direct petitioning protected in these cases, we do not believe they are protected by the Noerr- Pennington doctrine. In fact, the defendants' audacity in asserting that violence, criminal trespass, and vandalism are protected by the First Amendment, rivals Carry Nation's--after inciting a riot by smashing up a saloon with an axe, she declared, "There is a spirit of anarchy abroad in this town!" Robert Lewis Taylor, Vessel of Wrath: The Life and Times of Carry Nation, 201 (1966).[11]
 
 
 48
 We are convinced by the economic and legislative history of the Sherman Act that it was intended to prevent business competitors from making restraining arrangements for their own economic advantage. As the Court stated in Allen Bradley Co. v. Union, 325 U.S. 797, 811, 65 S.Ct. 1533, 1540, 89 L.Ed. 1939 (1945), "We know that Congress feared the concentrated power of business organizations to dominate markets and prices. It intended to outlaw business monopolies."[12] Defendants are not involved in business, and have no ability to concentrate economic power. This, together with the striking parallels between their activities and those of the temperance crusaders, which Congress, it would seem, intended to exclude from the operation of the Act, forces us to conclude that the defendants' activities are not prohibited by the Sherman Act.
 
 
 49
 We are not the first court to conclude that certain agreements are not within the scope of the antitrust laws. In Missouri v. NOW, 620 F.2d at 1301, the Eighth Circuit concluded that Congress probably did not intend to include political boycotts by non-competitors. The court in Marjorie Webster Jr. College v. Middle States Association of Colleges and Secondary Schools, 432 F.2d 650, 653 (D.C.Cir.), cert. denied, 400 U.S. 965, 91 S.Ct. 367, 27 L.Ed.2d 384 (1970), concluded that when restrictions on college accreditation have no commercial motive, "the process of accreditation is an activity distinct from the sphere of commerce; it goes rather to the heart of the concept of education itself. We do not believe that Congress intended this concept to be molded by the policies underlying the Sherman Act." Id. at 655 (footnotes omitted). See also Council for Employment & Economic Energy Use, 580 F.2d 9, 12 (1st Cir.1978) (Complaint alleging radio stations that agreed on amount of free air time for plaintiff's political opponent violated antitrust laws dismissed on 12(b)(6): "This case involves political opponents not commercial competitors; and political objectives not market place goals."), cert. denied, 440 U.S. 945, 99 S.Ct. 1421, 59 L.Ed.2d 633 (1979).
 
 
 50
 We observe, as we did in Havoco of America, Ltd. v. Shell Oil Co., 626 F.2d 549, 559 (7th Cir.1980), that "it is hard to ignore the suspicion that the facts have been forced into an antitrust mold to achieve federal jurisdiction." We believe it is unfortunate that the plaintiffs lack an effective remedy for the defendants' reprehensible conduct, but we find no antitrust violation here. But see Volunteer Medical Clinic, Inc. v. Operation Rescue, 948 F.2d 218 (6th Cir.1991) (discussing besieged abortion clinic's claim under 42 U.S.C. § 1985(3)). Non-commercial purpose alone will not shield activity from antitrust scrutiny, see Costello Publishing Co. v. Rotelle, 670 F.2d 1035 (D.C.Cir.1981) (dispute between lay and clerical members of Roman Catholic Church), but the defendants' acts are far beyond those that Congress intended to reach with the Sherman Act.
 
 
 51
 At bottom, the basic question presented by the plaintiffs' complaint is whether the antitrust laws protect an industry faced with violent opposition from some segment of the public. For example, could nuclear power providers or logging companies bring antitrust claims against the Earth First! organization for vandalism and trespass? See, e.g., Glenn Bohn Vansun, Walbran Activists Deny Link to Radical Environmental Group, Vancouver Sun, Sept. 21, 1991, at A1 (describing sabotage of nuclear plant's electrical lines, tree spiking, and logging equipment damage). We do not believe these kinds of actions are within the scope of the antitrust laws. The defendants' actions are directed against all centers providing abortions.
 
 
 52
 The Court's analysis in Apex Hosiery, another case involving violent, "reprehensible" conduct by defendants which fell outside the scope of the Sherman Act, bolsters our conclusion that the plaintiffs' complaint was properly dismissed. 310 U.S. at 484, 60 S.Ct. at 986. In Apex Hosiery, union members from nearby factories took over the plaintiff's plant and remained in possession for more than a month. Id. at 482, 60 S.Ct. at 985. The invaders changed the locks, wilfully wrecked machinery, and damaged property and equipment. Operations at the plant could not resume for two months after the plaintiff regained possession. Id. The union acted to force the plaintiff to hire only union employees. Id. at 482, 60 S.Ct. at 985.
 
 
 53
 The Court explained that although the union members violated the civil and penal laws of Pennsylvania, if no antitrust violation occurred, the violence and state-law violations did not confer federal jurisdiction. Id. at 483-84, 60 S.Ct. at 986-87. The Court rejected the union's contention that all labor activities are exempt from Sherman Act, id. at 487, 60 S.Ct. at 988, just as we reject defendants' contention that all "protest" or non-commercially oriented activities are exempt because of the First Amendment.
 
 
 54
 The Court analyzed the defendants' conduct, and determined that
 
 
 55
 the Sherman Act was directed only at those restraints whose evil consequences are derived from the suppression of competition in the interstate market, so as 'to monopolize the supply, control its price or discriminate between its would-be purchasers.' And in speaking of intent as a prerequisite to liability under the Act where the restraint to interstate commerce is 'indirect' [we] mean no more than that the conspiracy or combination must be aimed or directed at the kind of restraint which the Act prohibits or that such restraint is the natural and probable consequences [sic] of the conspiracy.
 
 
 56
 Apex Hosiery, 310 U.S. at 511, 60 S.Ct. at 1001 (quoting United Mine Workers v. Coronado Coal Co., 265 U.S. 457, 471, 44 S.Ct. 623, 627, 68 L.Ed. 1104 (1921)). The Court emphasized that the cases interpreting the Sherman Act recognized that "[t]he Sherman Act was not enacted ... to afford a remedy for wrongs, which are actionable under state law, and result from combinations and conspiracies which fall short, both in their purpose and effect, of any form of market control of a commodity, such as to monopolize the supply, control its price, or discriminate between its would-be purchasers." Id. 310 U.S. at 512, 60 S.Ct. at 1001. Finally, the Court emphasized that "[r]estraints not within the Act, when achieved by peaceful means, are not brought within its sweep merely because, without other differences, they are attended by violence." Id. at 513, 60 S.Ct. at 1002.
 
 
 57
 We find this reasoning applicable here. The plaintiffs have not alleged that the defendants are exercising market power to harm their businesses. Rather, the plaintiffs seek federal protection from the defendants' campaign of otherwise-criminal activities which are directed at destroying all health centers performing abortions. Plaintiffs have failed to make the required showing that the defendants have exerted market control of the supply of abortion services, control of price (beyond raising prices by increasing costs[13]), or discrimination between would-be purchasers.
 
 
 58
 The myriad cases upon which plaintiffs rely offer little help. We have found only one case where non-competitor defendants tried to destroy a plaintiff's business. Council of Defense v. International Magazine Co., 267 F. 390 (8th Cir.1920). In that case, the Counsel of Defense, a group of New Mexico residents, organized a boycott of the Hearst newspapers and magazines to protest what they perceived as Hearst's pro-German sympathies.
 
 
 59
 The court found the conspiracy to boycott and blacklist the publications was prohibited by the Sherman Act. We believe, however, that this case is no longer good law. In NAACP v. Claiborne Hardware Co., 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1981), the Court held that a sometimes-violent boycott organized by black people against white merchants was beyond the reach of economic regulation. Id. at 913, 102 S.Ct. at 3425. The boycott was designed to force civic and business leaders to comply with a list of demands for racial equality and integration. The Court, relying in part upon Eastern Railroad Presidents Conference v. Noerr Motor Freight, 365 U.S. at 127, 81 S.Ct. at 523 (1961), held that the non-violent aspects of political boycotts are protected by the First Amendment. Id. 458 U.S. at 915, 102 S.Ct. at 3426. Claiborne calls into question the holding in Council of Defense. We conclude that Council of Defense is not controlling here.
 
 
 60
 Because we find that Congress did not intend to include defendants' activities within the scope of the Sherman Act, we affirm the district court's dismissal of the plaintiffs' antitrust claims.
 
 IV. RICO
 
 61
 The Plaintiffs have also claimed that defendants Scheidler, Terry, Scholberg, Murphy, PLAL, Operation Rescue, and Project Life have violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(a), (c), (d).
 
 A. § 1962(a)
 
 62
 The plaintiffs alleged in count two of the complaint that PLAN, PLAL, and Operation Rescue violated § 1962(a)[14] because the donations they receive from supporters are derived from their racketeering activity. The racketeering activity is extortion under the Hobbs Act, 18 U.S.C. § 1951, directed at health centers, center employees, and patients. Plaintiffs asserted that "[i]t is well-known that the more outrageous and highly publicized the activities are, the more likely the RICO Defendants and the enterprises are to receive larger donations." RICO Case Statement, R. 469, at 22.
 
 
 63
 The district court dismissed the plaintiffs' claims under § 1962(a) because it found that the income defendants receive through donations was not "derived directly or indirectly, from a pattern of racketeering activity." 765 F.Supp. at 941. Because contributors were not extorted, the court held that the contributions were not derived from racketeering activities.
 
 
 64
 In reaching its holding, the district court relied heavily upon Hemmings v. Barian, 822 F.2d 688 (7th Cir.1987). In Hemmings, the defendant agreed to purchase the plaintiff's company for a cash downpayment, plus five subsequent cash payments and other consideration. Id. at 692. The plaintiff alleged that the defendant never intended to make the subsequent payments, and instead used the money to buy a second corporation. The plaintiff argued that the defendant violated § 1962(a) because the money saved by failing to make payments was "derived from a pattern of racketeering activity." Id.
 
 
 65
 We refused to accept this argument--we found that although the defendant may have used income he owed plaintiff to fund his second business, there was no suggestion that that income came from fraud. Id. The source of the misapplied income was "proper and aboveboard. The fraud was in promising to pay Hemmings the balance of the agreed purchase price ..., when Barian had no intention of ever paying it." Id. Because the money was lawful income, not extracted from the plaintiff (or anyone else) by fraud, we refused to find a RICO violation.
 
 
 66
 Plaintiffs argue that Hemmings does not support the district court's holding because "in Hemmings, the defendant did not 'derive' the money from anything illegal--he already had it. Here, the defendants had the money only after their well-publicized, unlawful acts prompted their supporters to send them the money...." Appellants' Brief at 48. This argument is unpersuasive. The plaintiffs argue based upon their reading of Azurite Corp. v. Amster & Co., 730 F.Supp. 571, 578 (S.D.N.Y.1990), that the Hemmings claim was dismissed because the plaintiff failed to plead a causal connection between the fraud and the income invested. Based on this reading, plaintiffs argue that Hemmings does not dictate the dismissal of their claim under § 1962(a) because they pleaded a connection.[15]
 
 
 67
 Plaintiffs attempt to bolster this argument with references to United States v. Vogt, 910 F.2d 1184, 1194 (4th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 955, 112 L.Ed.2d 1043 (1991), and United States v. McNary, 620 F.2d 621, 628 (7th Cir.1980). These cases are unavailing. In Vogt, the defendant, a customs officer, laundered bribe money through a group of dummy corporations that deposited money off-shore, brought it back into the United States, and then invested it. Vogt argued that the government failed to prove he invested the bribe money in the laundering enterprises. The court stated that "[s]ection 1962(a) does not exact rigorous proof of the exact course of income derived from a pattern of racketeering activity into its 'ultimate use or investment.' " Id. at 1194.
 
 
 68
 Plaintiffs point to this language in support of their contention that they adequately have alleged that the donations defendants receive are "derived" from their racketeering acts. This argument is specious--the Fourth Circuit was dismissing the argument that the government in its proof, must trace illegally received money "from its receipt to its ultimately proscribed 'use or investment' by the defendant." Id. In other words, plaintiffs in this case are not required to show the specific flow of contributions from the time the defendants receive them until they ultimately spend them. There was no question that Vogt derived income from racketeering--he took bribes.
 
 
 69
 McNary is analogous. McNary, as Mayor of Lansing, Illinois, was convicted of bribery and extortion. The issue on appeal was whether the government proved that McNary invested the $85,000 in bribery receipts in his family-owned travel company. We noted that the statute does not require "immediate or even direct use of illicit income to establish a violation of its terms.... To require ... that the evidence show a direct employment of illicit income is to ignore the clear proscription of the statute...." McNary, 620 F.2d at 628. Plaintiffs again misapprehend this language. See Appellants' Brief at 49. In McNary we held that interim deposits, commingled funds, and other accounting techniques do not bar liability. Section 1962(a) does not require the government to trace the course of each penny of illicit income through the defendant's hands. McNary, 620 F.2d at 629.
 
 
 70
 Thus the cases the plaintiffs cite are inapposite to their claim--at issue here is whether the defendants' contributions were derived from their extortionate acts. We agree with the district court that they were not. Plaintiffs concede that the contributions are only "indirect" income from the extortionate acts, but they argue this is sufficient under § 1962(a). That section does sanction the use of funds "derived, directly or indirectly, from a pattern of racketeering activity." The attenuated causal connection between the defendants' criminal trespass, threats, and vandalism, and their receipt of donations from third parties, however, is not sufficient.
 
 
 71
 The Supreme Court has noted that notions of proximate cause are properly applied to RICO. Holmes v. Securities Investor Protection Corp., --- U.S. ----, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). In Holmes, the Court held that an insurance company could not recover under § 1962 based upon the defendants' fraud on its insured and its insured's customers. Id. Proximate cause generally is associated with the determination in civil tort litigation as to whether the plaintiff's injury was direct enough to permit him to recover from the defendant. Id. 112 S.Ct. at 1318. Nevertheless, we believe this judicial tool for examining the directness of a relationship is helpful in this context. "At bottom, the notion of proximate cause reflects 'ideas of what justice demands, or of what is administratively possible and convenient.' " Id. (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Own, Prosser and Keeton on Law of Torts § 41, p. 264 (5th ed. 1984)). The cause and effect chain plaintiffs posit is something like this: defendants invade health centers, destroying property and injuring center staff; media covers event; potential contributors see media coverage and are favorably impressed; contributor sends donation; defendants receive income. Based in part upon notions of proximate cause, we believe this alleged relationship between the defendants' criminal acts and their supporters voluntary contributions is simply too tenuous to satisfy the requirements of § 1962(a).
 
 
 72
 We also find the cases interpreting the RICO forfeiture provisions of § 1963 support our conclusion. Section 1963(a)(1) requires that a defendant forfeit "any interest he has acquired or maintained in violation of § 1962...." In interpreting the term "interest" under this section, we have held that "the court must determine what portion of [the defendant's] interests would not have been acquired or maintained 'but for' his racketeering activities. United States v. Horak, 833 F.2d 1235, 1243 (7th Cir.1987). See also United States v. Ofchinick, 883 F.2d 1172, 1183 (3d Cir.1989) (applying Horak 's 'but for' test), cert. denied sub nom., DeLucia v. United States, 493 U.S. 1034, 110 S.Ct. 753, 107 L.Ed.2d 769 (1990); United States v. Porcelli, 865 F.2d 1352, 1365 (2d Cir.1989) (same), cert. denied, 493 U.S. 810, 110 S.Ct. 53, 107 L.Ed.2d 22 (1989).
 
 
 73
 Following this reasoning, under § 1962(a), "income derived, directly or indirectly, from a pattern of racketeering activity" is only income that the defendants would not have received 'but for' their racketeering conduct. Here, plaintiffs have not alleged that contributors would not have donated money to the defendants but for the defendant's predicate racketeering acts. Therefore, the income is not derived from racketeering activity for purposes of § 1962(a).
 
 B. § 1962(c)
 
 74
 In count three, plaintiffs allege that Pro-Life Action Network ("PLAN") operated as an enterprise in violation of § 1962(c). PLAN is a coalition of anti-abortion groups. The defendants who have participated in PLAN activities, the "PLAN defendants," are Scheidler, Ryan, Terry, Scholberg, Murphy, Wojnar, Migliorino, Pro-Life Action League ("PLAL"), Pro-Life Direct Action League ("PDAL"), Operation Rescue ("OR"), and Project Life.
 
 
 75
 Section 1962(c) prohibits conduct of an enterprise through a pattern of racketeering activity.[16] See Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). The district court dismissed the plaintiffs' § 1962(c) claims because it found that § 1962(c) requires that plaintiffs allege "some profit-generating purpose." Scheidler, 765 F.Supp. 937, at 943. The court read existing case law to require either the predicate acts of racketeering or the enterprise to have some financial motive. Id. at 942 (citing United States v. Flynn, 852 F.2d 1045, 1052 (8th Cir.1988), cert. denied, 488 U.S. 974, 109 S.Ct. 511, 102 L.Ed.2d 546 (1988)); United States v. Ferguson, 758 F.2d 843, 853 (2d Cir.1985), cert. denied, 474 U.S. 841, 106 S.Ct. 124, 125, 88 L.Ed.2d 102 (1985); United States v. Bagaric, 706 F.2d 42, 55 (2d Cir.1983), cert. denied, 464 U.S. 840, 104 S.Ct. 134, 78 L.Ed.2d 128 (1985); United States v. Ivic, 700 F.2d at 65; United States v. Anderson, 626 F.2d 1358, 1372 (8th Cir.1980), cert. denied, 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981). The plaintiffs argue that only an economic effect on interstate commerce is required, which they have alleged.
 
 
 76
 Whether or not liability under RICO may be imposed when neither the enterprise nor the racketeering acts are economically motivated is a question of first impression in this circuit. The other circuits are split on the issue. Compare United States v. Flynn, 852 F.2d 1045, 1052 (8th Cir.1988) ("For purposes of RICO, an enterprise must be directed toward an economic goal."); United States v. Ivic, 700 F.2d 51, 59-65 (2d Cir.1983) (same) with Northeast Women's Center, Inc. v. McMonagle, 868 F.2d 1342, 1349-40 (3d Cir.1989) (because predicate offense (Hobbs Act) does not require economic motive, RICO requires no additional economic motive), cert. denied, 493 U.S. 901, 110 S.Ct. 261, 107 L.Ed.2d 210 (1989); Feminist Women's Health Center v. Roberts, No. C86-1617, 1988 WL 156656, * 11 n. 2 (W.D.Wash., Mar. 11, 1988) (citing McMonagle and declining to follow Ivic). In his dissent from the denial of certiorari in McMonagle, Justice White noted the conflict.
 
 
 77
 Although we have never grappled with the economic motive issue head on, we have adopted the Eighth Circuit's definition of enterprise, which includes an economic goal requirement. United States v. Neapolitan, 791 F.2d 489, 500 (7th Cir.1986) (quoting United States v. Anderson, 626 F.2d 1358, 1372 (8th Cir.1980), cert. denied, 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981)), cert. denied, 479 U.S. 939, 107 S.Ct. 421, 93 L.Ed.2d 371 (1986). Other circuits have also adopted the Anderson formulation. See United States v. Perholtz, 842 F.2d 343, 363 (D.C.Cir.1988); United States v. Errico, 635 F.2d 152, 156 (2d Cir.1980).
 
 
 78
 Section 1961(4) states that an enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact though not a legal entity." In this case, PLAN does not appear to have legal status as a corporation, partnership, or association recognized by state law. Rather, it is a group that organizes anti-abortion activities. Hence, it comes under the "group of individuals associated in fact though not a legal entity" portion of § 1961.
 
 
 79
 Anderson and Neapolitan provide the framework for determining whether an informal association is an enterprise. In Anderson, two court administrators were charged with defrauding their employers through a false purchase-order scheme. 626 F.2d at 1980. The indictment alleged that each defendant's association with the salesman who supplied the phony invoices constituted the enterprise. Now, of course, the government more routinely alleges that the entities that employ such defendants are the enterprise, i.e. the sheriff's office, (United States v. Lee Stoller Enterprises, 652 F.2d 1313 (7th Cir.1981), cert. denied, 454 U.S. 1082, 102 S.Ct. 636, 70 L.Ed.2d 615 (1981)), the state's attorney's office, (United States v. Yonan, 800 F.2d 164 (7th Cir.), cert. denied, 479 U.S. 1055, 107 S.Ct. 930, 93 L.Ed.2d 981 (1986)), etc. The Anderson court found that the enterprise must "signify an association that is substantially different from the acts which form the pattern of racketeering activity." Anderson, 626 F.2d at 1365. After a thorough analysis of the statutory language, the court held that the term enterprise
 
 
 80
 encompass[es] only an association having an ascertainable structure which exists for the purpose of maintaining operations directed toward an economic goal that has an existence that can be defined apart from the commission of the predicate acts constituting the pattern of racketeering activity.
 
 
 81
 Id. at 1372 (emphasis added).
 
 
 82
 We adopted this holding in Neapolitan, where we too distinguished between the racketeering acts and the enterprise. 791 F.2d at 500. Neapolitan considered the enterprise in two RICO cases involving a stolen car ring. In one, police officers took bribes from car thieves, and were charged with conducting the sheriff's office (the enterprise) through a pattern of racketeering activity. In the other, the car thieves themselves operated a large scale "chop shop," which was allegedly the RICO enterprise.
 
 
 83
 As plaintiffs point out, economic motive was not an issue in either Neapolitan or Anderson. It was clear defendants were acting for financial gain. Another case adopting Anderson, United States v. Errico, 635 F.2d 152, 156 (2d Cir.1980), did place some emphasis on the profit motive. Errico involved a conspiracy to fix horse races. The court found that a circle of betters and jockeys, joined together through the defendant, satisfied the enterprise requirement because they regularly attempted to and did profit from the illegally fixed races. Id. at 156.
 
 
 84
 The lack of significant focus on motive weakens the authority of these cases somewhat on this particular issue, however, so we turn to the cases that have confronted it directly. The leading case, United States v. Ivic, 700 F.2d 51 (2d Cir.1983), involved a Croatian nationalist group that used "terror, assassination, bombings, and violence in order to foster and promote their beliefs and in order to eradicate and injure persons whom they perceived as in opposition to their beliefs." Id. at 58.
 
 
 85
 In a carefully reasoned opinion, the court in Ivic drew upon the language of the statute, its legislative history, Supreme Court precedent, and Justice Department Guidelines to determine that the enterprise or predicate acts must have an economic motive to violate RICO.
 
 
 86
 Reading 1962(c) together with sections (a) and (b), the Ivic court stated that the term enterprise in those sections referred to "an organized profit-seeking venture." Id. at 60. It noted there was no indication that Congress intended to have the same term mean something different in section (c). Indeed, the Supreme Court has stated that "We should not lightly infer that Congress intended [terms] to have wholly different meanings in neighboring subsections." Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 489, 105 S.Ct. 3275, 3281, 87 L.Ed.2d 346 (1984). The court examined the legislative history of the Act, and explained that the terrorist actions were not part of the "evil corruption of our commerce and trade" which the Act was intended to remedy. Ivic, 700 F.2d at 63 (quoting 116 Cong.Rec. 35295, remarks of Representative Poff).
 
 
 87
 The Ivic court observed that although United States v. Turkette, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), held that the term enterprise encompasses illegitimate organizations, it did not suggest the term reaches every such organization. Turkette recognized that RICO was originally directed at the infiltration of organized crime into legitimate business with funds raised through loan sharking, illegal gambling, and other criminal activities. Id. (citing Turkette, 452 U.S. at 591, 101 S.Ct. at 2532 (1981)). The Ivic court found that political terrorist organizations do not generate funds that could allow them to infiltrate legitimate business. Id. This court has noted that although infiltration by organized crime was the major concern of Congress, those concerns extended much further. Haroco v. American National Bank & Trust Co. of Chicago, 747 F.2d 384 (7th Cir.1984) (citing Turkette, 452 U.S. at 590-91, 101 S.Ct. at 2532-33), aff'd, 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985). In fact the Supreme Court has noted that "although [RICO] had organized crime as its focus, [it] was not limited in application to organized crime." H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 248, 109 S.Ct. 2893, 2904, 106 L.Ed.2d 195 (1989). Nevertheless, we believe congressional concerns may not have extended so far as the activities of political terrorists which involve neither economic crimes nor economic motivations.
 
 
 88
 The Ivic court also stated that the Justice Department's 1981 RICO Guidelines provided that a RICO indictment should not charge an association as an enterprise, unless the association exists "for the purpose of maintaining operations directed toward an economic goal...." Id. at 64. Based on these factors, the Ivic court held that an indictment that fails to charge that the enterprise or predicate acts had an economic motive does not state a crime under § 1962(c).
 
 
 89
 The Second Circuit returned to the issue in United States v. Bagaric, 706 F.2d 42 (2d Cir.), cert. denied, 464 U.S. 840, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983). Bagaric also involved a Croatian terrorist group, but the defendants also "perpetrated an extensive international extortion scheme using the United States and foreign mails." Id. at 46. The group, in addition to bombing, arson and murder, established a scheme to extort money from moderate Croatians in the United States to support their activities. Id. at 48. The group compiled a list of "potential wealthy victims, and threatened to squeeze [them] financially ..." Id. Extortion letters demanding $5,000 to $20,000 were posted from foreign countries directed victims to mail money to a post office box in Paraguay. Several individuals who resisted the extortion demands were killed. 706 F.2d at 50.
 
 
 90
 The court held that because some of the predicate acts were economically motivated, i.e. extorting money to finance terrorist activities, RICO's economic motivation requirement was satisfied. It pointed out that Ivic did not require that economic gain be the sole motive of every RICO violation. Id. at 53. Ivic only required that either the predicate acts or the enterprise be geared toward economic gain. Political motivations would not shield the "more than fifty acts of the classic economic crime of extortion...." simply because the money would be used for political ends. Id. at 58. Thus Bagaric reaffirmed Ivic's holding that the government (or a civil plaintiff) may show financial purpose through either the enterprise or the predicate racketeering acts. Id. at 56.
 
 
 91
 The Second Circuit revisited the issue again in United States v. Ferguson, 758 F.2d 843 (2d Cir.), cert. denied, 474 U.S. 1032, 106 S.Ct. 592, 88 L.Ed.2d 572 (1985). Ferguson involved bank and armored-truck robberies, and murders performed to support the Black Liberation Army. The defendants challenged their indictment under RICO because they were "revolutionaries." Id. at 853. The court explained, however, that RICO requires only "some financial purpose." Id. The defendants were charged with ten robberies and attempted robberies, and the murders of police and guards committed during the course of the robberies. The money obtained from the crimes was used to support the "revolutionary" enterprise. Because the defendants' activities were centered around the commission of economic crimes, the court held that RICO was properly applied to the defendants. Id.
 
 
 92
 Shortly after Ferguson was decided, the Supreme Court rejected the Second Circuit's interpretation of § 1962(c), which barred civil actions unless the defendant had been convicted of criminal charges and the plaintiff could show "racketeering injury." Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). Plaintiffs in this case argue that Sedima prohibits any limitation on the scope of RICO. Appellants' Brief at 37. We disagree. This court, in Haroco, Inc. v. American National Bank & Trust Co. of Chicago, 747 F.2d 384 (7th Cir.1984), aff'd, 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985), rejected the racketeering injury requirement, and held that injuries caused by the predicate acts of racketeering satisfy RICO. Id. at 388. We noted with some concern the Second Circuit's attempts to limit RICO to organized crime activities, and rejected that limitation.
 
 
 93
 Although we have resisted attempts to limit the scope of civil RICO, see, e.g., Morgan v. Bank of Waukegan, 804 F.2d 970, 975-76 (7th Cir.1986) (multiple schemes not required for pattern of racketeering activity); Schacht v. Brown, 711 F.2d 1343 (7th Cir.) (rejecting argument that RICO limited to organized crime), cert. denied, 464 U.S. 1002, 104 S.Ct. 508, 78 L.Ed.2d 698 (1983), we do not believe the limitation imposed by the Ivic, Bagaric, Ferguson, line of cases is unwarranted. We recognize that "[e]ven if Congress did not anticipate all of the consequences of RICO, the breadth of the statute, including the civil provisions, was the result of deliberate policy choices on the part of Congress." Haroco, 747 F.2d at 398-99. But, as the Second Circuit discussed in Ivic, we believe the use of the term enterprise in §§ 1962(a) and (b) conveys a restriction to economic entities. Ivic, 700 F.2d at 61.
 
 
 94
 This court has also looked to the provisions of § 1962(a) to guide our interpretation of § 1962(c), albeit on a different point. See Haroco, 747 F.2d at 402 (interpreting interaction of roles of "enterprise" and "person"). The courts have extended the economic motivation limitation by allowing economically motivated predicate acts to bring conduct within the scope of RICO. Further expansion does not seem justified. "[W]e do not think the general principle of liberal interpretation of RICO can be used to stretch section 1962(c) to reach this situation in the face of the subsection's own limits." Haroco, 747 F.2d at 400.
 
 
 95
 Further, the Court in Sedima seemed particularly troubled by the vague, amorphous nature of the racketeering injury requirement. Sedima, 473 U.S. at 494-95, 105 S.Ct. at 3283-84. The economic motive requirement does not have this weakness. Moreover, the Court held that the statute requires only that the plaintiff allege each element of the violation, and that courts should not graft on additional elements. Id. at 497, 105 S.Ct. at 3284. In this case we do not believe we are adding elements to the offense, but merely fleshing out the definitions of those elements.
 
 
 96
 Further, despite its urging to avoid undue limitations of civil RICO, the Court has referred consistently to "businesses":
 
 
 97
 Congress wanted to reach both 'legitimate' and 'illegitimate' enterprises. Legitimate businesses enjoy neither an inherent incapacity for criminal activity nor immunity from its consequences; and, as a result, § 1962(c)'s use against respected businesses allegedly engaged in a pattern of specifically identified criminal conduct is hardly a sufficient reason for assuming that the provision is being misconstrued.
 
 
 98
 Northwestern Bell, 492 U.S. at 229, 109 S.Ct. at 2893. This emphasis on business--economic activity--bolsters our conclusion that non-economic crimes committed in furtherance of non-economic motives are not within the ambit of RICO. We also find support in the economic motive requirement discussed in Anderson, Neapolitan, and Flynn, supra.
 
 
 99
 We do not believe that requiring an economic motive will place undue limitations upon RICO actions. Nor do we believe our holding flies in the face of the Supreme Court's dictates in Sedima and Northwestern Bell. Indeed, we find that this interpretation of § 1962(c) is dictated by the terms of the statute. Thus, although we agree with the Third Circuit's interpretation of the Hobbs Act,[17] we decline to follow its holding that, in these circumstances involving a non-economic enterprise committing non-economic predicate acts, plaintiffs may invoke the provisions of RICO. McMonagle, 868 F.2d at 1349-50.
 
 
 100
 The plaintiffs argue that, even if there is an economic motive requirement, they have alleged that the defendants committed unlawful acts to raise funds. More specifically, that the defendants received contributions as a result of their extortionate acts and, that they sold materials detailing unlawful methods of closing health centers. The plaintiffs argue that it is reasonable to infer from these allegations that the defendants committed extortionate acts to raise funds. In addition, they contend that defendants' activities were economically motivated because they were aimed at increasing the plaintiffs' costs of doing business. Increasing their costs, plaintiffs argue, satisfies the economic purpose requirement. Finally, plaintiffs argue that they are entitled to prove that the defendants intended to generate financial gain by selling materials advocating criminal acts against the centers.
 
 
 101
 There are several problems with these contentions. First, it is not reasonable to infer that the purpose of the defendants' extortion is to raise funds. It is clear that the aim of the extortion is to close women's health centers, as plaintiffs have repeatedly alleged throughout their complaint. See Second Amended Complaint at 3, 10, 11, 13, 14, 18, etc. That reprehensible criminal and tortious conduct results incidentally in donations to support it, is more a comment on the nature of the defendants' supporters than on the purpose of the defendants' acts.
 
 
 102
 Second, none of the cases discussing an economic motive requirement adopt the plaintiffs' theory that raising the victim's costs satisfies the requirement. In fact, Ivic itself seems to contradict such an interpretation. In Ivic, victims' businesses were threatened with arson and bombing. Certainly this would increase their "costs," although the defendants' motive in that case was political coercion unrelated to the operation of the businesses. Ivic, 700 F.2d at 58. The plaintiffs' argument seems to be a vestige of the "raising rivals' costs" argument raised in their antitrust claim. We do not contest that the defendants' activities had an economic effect on the plaintiffs, we simply refuse to equate that effect with the economic motive required by Ivic and its progeny.
 
 
 103
 Finally, selling materials advocating a particular viewpoint, even if the materials advocate illegal actions, is not a predicate racketeering activity. Therefore income derived from the sales is not income derived from racketeering activity. Moreover, unless the materials violate the "clear and present danger" test, their distribution is protected by the First Amendment. Cf. Cantwell v. Connecticut, 310 U.S. 296, 308, 60 S.Ct. 900, 905, 84 L.Ed. 1213 (1939):
 
 
 104
 No one would have the hardihood to suggest that the principle of freedom of speech sanctions incitement to riot or that religious liberty connotes the privilege to exhort others to physical attack upon those belonging to another sect. When clear and present danger of riot, disorder, ... or other immediate threat to public safety, peace, or order, appears, the power of the State to prevent or punish is obvious.
 
 
 105
 For these reasons, we find no merit in the plaintiffs' argument that they have satisfied the economic motive requirement of § 1962(c).
 
 C. § 1962(d)
 
 106
 Under count four, plaintiffs charge that PLAN, PLAL, and Operation Rescue conspired to violate sections 1962(a) and (c), an offense punishable by § 1962(d). Because plaintiffs claims under sections 1962(a) and (c) fail, we find no violation of § 1962(d).
 
 V.
 
 107
 In conclusion, despite the reprehensible nature of the defendants' activities, we find that they are not within the reach of the Sherman Act or RICO. Therefore, the judgment of the district court is
 
 
 108
 AFFIRMED.
 
 ORDER
 
 109
 On consideration of the petition for rehearing and suggestion for rehearing en banc filed in the above-entitled cause by plaintiffs-appellants, no judge in active service has requested a vote thereon[1], and all of the judges on the original panel have voted to deny the petition for rehearing and suggestion for rehearing en banc.
 
 
 110
 Accordingly, it is hereby ordered that the aforesaid petition for rehearing and suggestion for rehearing en banc be and the same is hereby DENIED.
 
 
 
 [1]
 The Honorable Bruce M. Van Sickle, Senior Judge of the United States District Court for the District of North Dakota, is sitting by designation
 
 
 [2]
 For purposes of simplicity, we shall refer to the second amended complaint (Record Document 236) in text as "the complaint."
 
 
 [3]
 NOW sought class certification for itself, its women members who use or may use the targeted health centers, and other women who use or may use the services of such centers. The health-center plaintiffs sued on behalf of themselves and all other similarly-situated centers performing abortions. The district court did not certify either class, apparently deferring its ruling until resolution of the motions to dismiss. See Minute Order of 1/08/88. All pending motions were dismissed as moot when the court granted defendants' motion to dismiss. See National Organization for Women v. Scheidler, 765 F.Supp. 937, 945 (N.D.Ill.1991)
 
 
 [4]
 When we use the terms illegal and unlawful to describe the defendants' activities, we refer not to violations of RICO or the antitrust laws, but to acts that are otherwise unlawful, such as trespass and vandalism
 
 
 [5]
 The district court also found that the defendants, in particular Scheidler, have links with arsonists who have fire-bombed health centers. The court also found that the defendants have not condemned fire-bombing. The court made these findings after defendant Wojnar moved for Rule 11 sanctions based upon the plaintiffs' allegation of the association in a pleading. See Denial of Defendant Wojnar's First Motion for Sanctions, March 27, 1992
 
 
 [6]
 We note that the boycott in Missouri v. NOW is readily distinguishable from the defendants' actions in this case. The boycott was a peaceful, otherwise lawful attempt to influence legislation. In this case defendants' conduct (trespass, extortion, vandalism, and theft) violates state criminal laws. "The First Amendment does not protect violence. 'Certainly violence has no sanctuary in the First Amendment, and the use of weapons, gunpowder, and gasoline may not constitutionally masquerade under the guise of advocacy.' " NAACP v. Claiborne Hardware, Inc., 458 U.S. 886, 916, 102 S.Ct. 3409, 3427, 73 L.Ed.2d 1215 (1981) (quoting Samuels v. Mackell, 401 U.S. 66, 75, 91 S.Ct. 764, 769, 27 L.Ed.2d 688 (1970) (Douglas, J., concurring)). Moreover, the avowed purpose of the defendants' activities is to close centers, not influence government actors
 
 
 [7]
 Senator James Z. George (D. Miss.). See 1 Earl W. Kintner, The Legislative History of the Federal Antitrust Laws and Related Statutes 15 (1978)
 
 
 [8]
 William M. Stewart (R. Nevada). Id. at 79
 
 
 [9]
 James F. Wilson (R. Iowa). Id. at 20
 
 
 [10]
 George F. Hoar (R. Massachusetts). Id. at 14
 
 
 [11]
 We also note Professor Fischel's point that "conduct unprotected by Noerr does not necessarily constitute an antitrust violation." Daniel R. Fischel, Antitrust Liability for Attempts to Influence Government Action: The Basis & Limits of the Noerr-Pennington Doctrine, 45 U.Chi.L.Rev. 80, 82 (1977)
 
 
 [12]
 Allen Bradley involved an illegal combination of a labor union, contractors, and manufacturers
 
 
 [13]
 This is not to say that cartels or would-be monopolists who try to injure competitors by raising costs are not subject to the antitrust laws. See, e.g., Premier Electric Construction Co. v. National Electrical Contractors Ass'n, 814 F.2d 358, 368 (7th Cir.1987) (discussing anticompetitive effects, and thus illegality, of raising rivals' costs). See also 3 Milton Handler, Antitrust in Transition 1178-79 (1991)
 
 
 [14]
 18 U.S.C. § 1962(a) provides in relevant part:
 It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect interstate commerce.
 
 
 [15]
 Azurite held that defendants who were able to purchase stock at artificially low prices because of their fraudulent SEC filings derived income from the fraud within the meaning of § 1962(a)
 
 
 [16]
 § 1962(c) provides:
 It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
 
 
 [17]
 The Hobbs Act, 18 U.S.C. § 1951, which punishes obstruction of interstate commerce through extortionate means, does not require that the defendant profit economically from the extortion. See Town of West Hartford v. Operation Rescue, 915 F.2d 92, 102 (2d Cir.1990); United States v. Anderson, 716 F.2d 446 (7th Cir.1983) (defendant kidnapped and threatened to kill physician unless he agreed to cease performing abortions violated Act); United States v. Starks, 515 F.2d 112 (3d Cir.1975) ("solicitations" for religious purposes not exempt from Hobbs Act)
 
 
 [1]
 The Honorable Kenneth F. Ripple, did not participate in the consideration of the suggestion for rehearing en banc